### INDIANA MICHIGAN POWER COMPANY, et al., Petitioners,

v.

### DEPARTMENT OF ENERGY and United States of America, Respondents,

### Northern States Power Company (Minnesota), et al., Intervenors.

### Nos. 95–1279, 95–1321 and 95–1463.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1996.

Decided July 23, 1996.

Jay E. Silberg, argued the cause, for utility petitioners/intervenors, with whom Michael A. Carvin, Vincent J. Colatriano, George L. Edgar and Michael A. Bauser, Washington, DC, were on the briefs. Don L. Keskey, argued the cause, for state petitioners, with whom Thomas L. Casey, Henry J. Boynton, Lansing, MI, Lester M. Bridge-

man, Mobile, AL, Patricia M. French, Providence, RI, Jocelyn F. Olson, St. Paul, MN, Robert S. Golden, Jr., Hartford, CT, John W. Malley, Jr., Lawrence F. Barth, North of Harrisburg, PA, John F. Povilaitis, Harrisburg, PA, Edward W. O'Neill, San Anselma, CA, Roger W. Steiner, Altamonte Spg. FL, Barbara E. James, Madison, WI, Lawrence G. Malone, Albany, NY, John S. Gillig, Frankfort, KY, Robert D. Vandiver, Jackson, TN, Richard C. Bellak, Tallahassee, FL, Mary W. Cochran, Paul R. Hightower, Little Rock, AR, John W. Campbell, L. Steven Grasz, Lincoln, NE, Michael A. Gross, Judith S. Yogman, Boston, MA, Bryan G. Moorhouse, Baltimore, MD, Susan S. Miller, Kevin P. Maloney, Buffalo, NY, Charles F. Walker, Wilmington, DE, Diane Munns, Des Moines, IA, Michael B. Hare, Baltimore, MD, Charles L. Moulton, Little Rock, AR, Wynn E. Arnold, Concord, NH, Caroline Vachier, Helene S. Wallenstein, Newark, NJ, James E. Ryan, Jr., Richmond, VA, James R. Carroll and Ben Stead, Des Moines, IA, were on the briefs. Robert T. Stephan, Wichita, KS, Larry G. Watterworth, Lansing, MI, Jeffrey A. Keevil, Jefferson City, MO, James E. Weging, Chicago, IL, Robert W. Parnacott, Topeka, KS, Douglas E. Eidahl, Pierre, SD, Harvey Y. Morris, San Francisco, CA, and James R. Anderson entered appearances.

John A. Bryson, Attorney, United States Department of Justice, argued the cause, for respondent, with whom Lois J. Schiffer, Assistant Attorney General, Martin W. Matzen, Attorney, and Marc Johnston, Deputy General Counsel, Washington, DC, United States Department of Energy, were on the brief.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The Nuclear Waste Policy Act ("NWPA") of 1982 authorized the Secretary of Energy ("Secretary") to enter contracts with owners and generators of high-level radioactive waste and spent nuclear fuel ("SNF") under which the private parties were to pay the Secretary statutorily imposed fees in return for which the Secretary, "beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or [SNF] in-

volved...." 42 U.S.C. § 10222(a)(5)(B) (1994). Petitioners are utilities and state commissions who paid fees to the Secretary under the statute. They seek review of the Department of Energy's ("DOE") final interpretation declaring that the Department has no obligation to perform its part of the contractual bargain. We conclude that the Department's interpretation is not valid and we therefore allow the petition for review.

## Background

In the NWPA, Congress created a comprehensive scheme for the interim storage and permanent disposal of high-level radioactive waste generated by civilian nuclear power plants. NWPA establishes that, in return for a payment of fees by the utilities, DOE will construct repositories for SNF, with the utilities generating the waste bearing the primary responsibility for interim storage of SNF until DOE accepts the SNF "in accordance with the provisions of this chapter." 42 U.S.C. § 10131(a)(5).

The NWPA requires the utilities to enter into standard contracts with DOE for the disposal of the waste. According to the statute, the contracts shall provide that:

(A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and

(B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel as provided in this subchapter.

42 U.S.C. § 10222(a)(5). The final standard contract adopted by DOE, following notice and comment, states that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF ... from the civilian nuclear power reactors specified ... has been disposed of." 10 C.F.R. § 961.11, Art. II (1996).

In 1993, several states and utilities became concerned about DOE's ability to meet its obligations under the NWPA. Therefore, they requested DOE to address its responsibilities under the NWPA, particularly section 302(a)(5), 42 U.S.C. § 10222(a)(5), and the January 31, 1998 deadline. Daniel Dreyfuss, Director of DOE's Office of Civilian Radioactive Waste Management, responded in a letter that DOE "does not have a clear legal obligation under the [NWPA] to accept [SNF] absent an operational repository or other facility." In February 1994, DOE's Secretary, Hazel O'Leary, indicated that, while at the time NWPA was enacted DOE "envisioned that it would have a waste management facility in operation and prepared to begin acceptance of [SNF] in 1998," DOE subsequently concluded it did not have "a clear legal obligation under the [NWPA] to accept [SNF] absent an operational repository or other facility constructed under the [NWPA]."

To address this issue, on May 25, 1994, DOE published a Notice of Inquiry on Waste Acceptance Issues ("NOI"), requesting the views of affected parties on matters relating to the continued storage of SNF at reactor sites beyond 1998. 59 Fed.Reg. 27,007 (1994). DOE presented its preliminary finding that it had "no statutory obligation to accept [SNF] beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA]." *Id.* at 27,008. DOE did note, however, that the terms of the Standard Contract may have created such an expectation. *Id.*

On June 20, 1994, utility petitioners ("utilities") and state petitioners ("states") filed petitions for review against DOE. This Court dismissed the petitions, finding that the NOI did not constitute final agency action. *Northern States Power Co. v. DOE*, Nos. 94–1457, 94–1458, 94–1574, 1995 WL 479714 (D.C.Cir. July 28, 1995) (order granting motion to dismiss case).

On April 28, 1995, DOE issued its Final Interpretation. *Final Interpretation of Nuclear Waste Acceptance Issues*, 60 Fed.Reg. 21,793 (1995). In the Final Interpretation, DOE stated that it would not be able to begin taking SNF by January 31, 1998, the date established by the NWPA. *Id.* at 21,-793–94. DOE concluded that it did not have an unconditional statutory or contractual obligation to accept high-level waste and spent fuel beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the NWPA. *Id.* The agency also determined that it had no authority under the NWPA to provide interim storage in the absence of a facility that has been authorized, constructed and licensed in accordance with the NWPA. *Id.* at 21,797. Finally, DOE declared that, even if it did have an unconditional obligation under the statute, the Delays Clause of the Standard Contract would provide an administrative remedy for DOE's failure to satisfy an obligation under the statute. *Id.*

Petitioners and intervenors then filed their petitions for review of the Final Interpretation.

## Analysis

 In reviewing an agency's construction of a statute entrusted to its administration, we follow the two-step statutory analysis established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, we ask whether Congress has spoken unambiguously to the question at hand. If it has, then our duty is clear: "We must follow that language and give it effect." *Wisconsin Elec. Power Co. v. DOE*, 778 F.2d 1, 4 (D.C.Cir.1985). If not, we consider the agency's action under the second step of *Chevron*, deferring to the agency's interpretation if it is "reasonable and consistent with the statute's purpose." *Nuclear Info. Resource Serv. v. NRC*, 969 F.2d 1169, 1173 (D.C.Cir.1992) (quoting *Chemical Mfrs. Ass'n v. EPA*, 919 F.2d 158, 162–63 (D.C.Cir.1990)). We now apply that review to the Department's interpretation of section 302(a)(5)(B).

Section 302(a)(5)(B) states that "in return for the payment of fees ... [DOE], beginning not later than January 31, 1998, will dispose of the [SNF]...." The states and utilities contend that this provision means what it says: in return for the payment of fees to the utilities, DOE will begin accepting

SNF not later than January 31, 1998. DOE argues that this language does not in fact require it to begin to dispose of SNF by January 31, 1998; rather, the agency contends that this obligation is further conditioned on the availability of a repository or other facility authorized, constructed, and licensed in accordance with the NWPA. DOE contends that this is the only interpretation possible when one examines the statute as a whole.

To support this interpretation, the Department first argues that Congress's use of the term "dispose" in section 302(a)(5)(B), which provides that DOE "will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter," presupposes the availability of a repository. Although conceding that the statute does not define "dispose," DOE notes that the statute does define "disposal" as "the emplacement in a repository of ... spent nuclear fuel ... with no foreseeable intent of recovery." 42 U.S.C. § 10101(9). DOE contends that "dispose" is simply a different grammatical form of "disposal," and that Congress must have intended the two terms be interpreted consistently. Thus, it argues, section 302 must require a repository be operational before DOE may begin accepting SNF.

We disagree. The phrase "dispose of" is a common term. It has a common meaning. For example, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 654 (1961) defines it as meaning, among other things, "to get rid of; throw away; discard." Admittedly, that and other dictionaries list other definitions. Each of those definitions, however, is consistent with the one set forth and not consistent with a limitation for placing the object of the phrase "in the disposal." There is no indication in the statute that Congress intended the words to be used in any but their common sense. See McNally v. United States, 483 U.S. 350, 358–59, 107 S.Ct. 2875, 2880–81, 97 L.Ed.2d 292 (1987) (interpreting commonly used phrase according to "common understanding" where Congress had "not indicat[ed]" an intent to depart from it). Indeed, the very fact that Congress defined "disposal" restrictively and did not define "dispose" bears mute testimo-

ny to the strong possibility that Congress intended the former as a term of art, the latter as common English. Indeed, DOE itself has previously concluded that the statutory definition of "disposal" was not intended to define "dispose of." In an April 1, 1987 letter, DOE's general counsel, although responding to a different issue, wrote "we doubt that the[se] terms were intended to have identical meanings." Furthermore, if DOE's obligation to dispose of waste was linked exclusively to the Act's definition of "disposal" then that obligation would be conditioned only upon the availability of a *repository*. However, Article II of the Standard Contract provides that DOE will provide its services after commencement of "facility" operations, 10 C.F.R. 961.11, with "facility" being defined as including both a repository and "such other facilit[ies] to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility." *Id.* at Article I. It is difficult to see how that paragraph and the Department's interpretation of the statutory section can sensibly coexist.

Perhaps more importantly, we must interpret the section in light of the whole statutory scheme. *See Bailey v. United States,* —— U.S. ——, ——, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995) (observing that a court must "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme.") In the scheme before us, indeed in another subsection of the very section under review, Congress used even the elsewhere narrowly defined "disposal" to encompass more than "emplacement in a repository of ... spent nuclear fuel ... with no foreseeable intent of recovery." That is, in section 302(d), 42 U.S.C. § 10222(d), Congress authorizes the Secretary to make expenditures "for purposes of radioactive waste disposal activities," and expressly includes within the ambit of authorized "disposal" activities those conducted not only in connection with repositories, but also with "any ... monitored retrievable storage facility or test and evaluation facility constructed under this chapter." 42 U.S.C. § 10222(d)(1). Therefore, even if we look to Congress's use of "disposal" to enlighten our

interpretation of "dispose of," we still find that Congress has not evidenced limited usage for which the Department argues.

DOE next argues that subsections (A) and (B) of 302(a)(5) are not independent provisions, but rather must be read together because taking title to the waste cannot be separated from the disposal activities. To support this proposition, DOE cites section 302(a)(1), which describes the Standard Contract as "for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel" and section 123, which provides that "[d]elivery and acceptance by the Secretary, of any high-level radioactive waste or spent nuclear fuel for a repository constructed under this part shall constitute a transfer to the Secretary of title to such waste and spent fuel." 42 U.S.C. § 10143. Respondent contends that these provisions evince Congress's intent that DOE take title to the waste before proceeding with disposal. According to DOE, any other interpretation of these sections would result in an anomaly in which one party would have ownership of the SNF while another party would have physical control of it.

We do not find this argument persuasive. Sections 302(a)(5)(A) and (B) clearly set forth two independent requirements. These separate obligations are independent of whether DOE holds title to SNF when it begins to dispose of the material. The duties imposed on DOE under subsections (A) and (B) are linked to different events and are triggered at different times. DOE's duty under subsection (A) to take title to the SNF is linked to the commencement of repository operations and is triggered when a generator or owner of SNF makes a request to DOE. DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998. Nowhere, however, does the statute indicate that the obligation established in subsection (B) is somehow tied to the commencement of repository operations referred to in subsection (A).

This conclusion is reinforced by the placement of the two requirements in the Standard Contract. DOE's obligation *to dispose* of SNF under section 302(a)(5)(B) is set forth in Article II–Scope, 10 C.F.R. § 961.11, whereas DOE's obligation *to take title* to SNF under section 302(a)(5)(A) is set forth in Article VII–Title. *Id.* In addition, contrary to DOE's assertions, it is not illogical for DOE to begin to dispose of SNF by the 1998 deadline and yet not take title to the SNF until a later date. As the utilities point out, it is not unusual, particularly in the nuclear area, to recognize a division between ownership of materials and other obligations relating to such materials. For example, the Nuclear Regulatory Commission recognizes a distinction between the ownership of nuclear materials and the right to possess or use such materials. *See also* 10 C.F.R. § 70.20; 10 C.F.R. § 40.21.

In fact, a comparison of paragraphs (A) and (B) argues against the Department's position. In (A), Congress expressly conditioned the obligation of the Secretary on the commencement of the operation of a repository. In (B), Congress imposed no such condition, but rather directed the beginning of the Secretary's duty as "not later than January 31, 1998," without qualification or condition. The only limitation placed on the Secretary's duties under (B) is that that duty is "in return for the payment of fees established by this section." The Department's treatment of this statute is not an interpretation but a rewrite. It not only blue-pencils out the phrase "not later than January 31, 1998," but destroys the *quid pro quo* created by Congress. It does not survive the first step of the *Chevron* analysis. 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Under the plain language of the statute, the utilities anticipated paying fees "in return for [which] the Secretary" had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain. The Secretary now contends that the payment of fees was for nothing. At oral argument, one of the panel compared the government's position to a Yiddish saying: "Here is air; give me money," and asked counsel for the Department to distinguish the Secretary's position. He found no way to do so, nor have we.

Finally, respondent asserts that reading subsection (B) as creating an unconditional obligation cannot be reconciled with other requirements of the statute, noting that the NWPA provides a complex scheme for the authorization, construction and licensing of a repository or monitored retrieval storage facility. DOE contends that "many contingencies facing the commencement of repository operations strongly undercut the assumption that Congress intended to require disposal by 1998 no matter what the outcome."

Although Congress anticipated the existence of a repository by 1998, the fact that such a repository does not exist does not make subsection (B) illogical; it simply affects the remedy we can provide. We agree with DOE that Congress contemplated a facility would be available by 1998; however, that Congress contemplated such a facility would be available does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility. It does not make sense to assert that Congress would express an intent to exempt DOE from the ·January 31, 1998 deadline by including specific statutory procedures regarding the siting and development of a repository in the NWPA. Rather, these prerequisites evince a strong congressional intent that DOE's various obligations be performed in a timely manner. *See, e.g., Tennessee v. Herrington,* 806 F.2d 642, 648 (6th Cir.1986) ("[T]he overall structure of the Act does reveal a consistent concern for timely implementation of the disposal provisions."), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987). DOE's interpretation of the provisions does not harmonize them. Instead, its interpretation reads into section 302(a)(5)(B) language that appears only in section 302(a)(5)(A) and reads out of section 302(a)(5)(B) language that actually appears in that provision.

It is premature to determine the appropriate remedy, particularly as to the interaction between Article XI and Article XVI of the Standard Contracts, as DOE has not yet defaulted upon either its statutory or contractual obligation. We therefore will remand this matter for further proceedings consistent with this opinion.

## Conclusion

In conclusion, we hold that the petitioners' reading of the statute comports with the plain language of the measure. In contrast, the agency's interpretation renders the phrase "not later than January 31, 1998" superfluous. Thus, we hold that section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998. The decision of the Secretary is vacated, and the case is remanded for further proceedings consistent with this opinion.