COAST ALLIANCE, et al., Plaintiffs,

v.

Bruce BABBITT, Secretary, United States Department of the Interior, et al., Defendants.

No. Civ.A. 97–1344(EGS).

United States District Court, District of Columbia.

March 5, 1998.

Eric R. Glitzenstein, Katherine A. Meyer, Howard B. Crystal, Meyer & Glitzenstein, Washington, D.C., for plaintiffs.

Caroline Zander, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., Eileen Sobeck, Mark A. Brown, U.S. Department of Justice, Wildlife & Marine Resources Section, Washington, D.C., for defendants.

William P. Horn, Douglas S. Burdin, Birch, Horton, Bittner & Cherot, Washington, D.C., for intervenors.

### *MEMORANDUM OPINION & ORDER*

SULLIVAN, District Judge.

## I. Introduction

The Coast Alliance, the Center for Marine Conservation, the Caribbean Conservation Corporation, Dr. Blair Witherington, Dr. Robert Stoll, Dr. Deborah Crouse, Dr. John K. Mahon, and Christine Perretta ("plaintiffs") challenge the actions of the Department of the Interior and the United States Fish and Wildlife Service with respect to boundary changes to the Coastal Barrier Resource System ("CBRS") and seek to declare the changes unlawful. Plaintiffs have also named the Federal Emergency Management Agency as a defendant because that agency provides federal flood insurance to lands that are not within the coverage of the CBRS.

Pending before the Court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1] The Court has considered the parties' motions, oppositions, replies, and counsels' representations at oral argument, as well as the applicable statutory and case law. For the following reasons, the Court concludes that the plaintiffs' motion for summary judgment must be **GRANTED** and the defendants' and intervenors' motions for summary judgment must be **DENIED**.

## II. Background

### A. Parties

Plaintiffs are environmental organizations and individuals with recreational and professional interests who oppose development of the approximately 36 acres of beaches and coastal areas that will now be excluded from CBRS protection as a result of changes mandated by § 220 of the Omnibus Parks and Public Lands Management Act of 1996,

---

1. Plaintiffs' original motion for a preliminary injunction was converted into a motion for summary judgment.

Pub.L. 104–333, 110 Stat. 4115. Plaintiffs claim that development of these areas will result in, among other things, destruction of endangered and threatened sea turtle nesting sites.

Defendants are Bruce Babbitt, Secretary of the Department of the Interior ("DOI" or "the agency"), John Rogers, Acting Director of the United States Fish and Wildlife Service ("FWS"), and James Witt, Director of the Federal Emergency Management Agency ("FEMA").[2]

Intervenors are two landowners who seek to maintain the changes made to the CBRS by § 220. The landowners bought their properties allegedly unaware that they were covered by the CBRS. Intervenor Santa Lucea Associates owns 10.4 acres of the land at issue and Intevenor Paul Savage owns 7.5 acres. These landowners petitioned Congress and succeeded in removing their lands from the coverage of the CBRS, arguing that since the properties were already developed, they had mistakenly been included in the system. Since passage of § 220, which removed their lands from CBRS coverage, intervenors have invested additional resources in developing their properties.

**B. Events**

In 1982, Congress enacted the Coastal Barrier Resource Act (CBRA), 16 U.S.C. § 3501 *et seq.*, to guarantee the protection of certain wildlife along U.S. coasts. The areas identified for protection are not eligible for federal flood insurance and consequently, little or no development is undertaken on these lands. *See* 16 U.S.C. § 3501(b) (stating that purposes of CBRS include minimizing loss of natural resources by "restricting future Federal expenditures and financial assistance which have the effect of encouraging development of coastal barriers").

In § 220 of the Omnibus Parks and Public Lands Management Act of 1996, Pub.L. No. 104–333, Congress amended the CBRA to exclude approximately 36 acres of land previously protected under the CBRS. Under § 220, the Secretary of the Interior was to make changes to the existing CBRS boundaries "consistent with the depictions of areas appearing on the maps entitled 'Amendments to Coastal Barrier Resources System', dated November 1, 1995, and June 1, 1996, and *on file with the Secretary.*" § 220(a) (emphasis added).

Following enactment of § 220 on November 12, 1996, DOI discovered that it could not locate the maps referenced in § 220.[3] As a result, on December 4, 1996, Jane Lyder, Acting Legislative Counsel of DOI, wrote identical letters to Don Young, the Chairman of the House Committee on Resources, and to John H. Chafee, Chairman of the Senate Committee on Environment and Public Works, stating that DOI had not been able to make the changes because "the maps are not and never have been on file with the Secretary or any other official of the Department." Letter from Lyder to Young of 12/4/96 (Pls.' Ex. B). In response, Congressman Young wrote to Lyder the next day, December 5, 1996, and attached to his letter maps he described as "the same maps referenced in your December 4, 1996 letter." Letter from Young to Lyder of 12/5/96 (Pls.' Ex. C).

---

**2.** Plaintiffs joined FEMA as a defendant on the grounds that complete relief could not be granted without FEMA. During the hearing on these motions, Plaintiffs conceded that if FEMA would be presumed to comply with any order of this Court invalidating DOI's changes to the CBRS as a result of § 220, then FEMA did not need to be a defendant in this case. This Court agrees with the government that FEMA is not a proper defendant and therefore dismisses FEMA as a defendant in this case.

**3.** Intervenors have submitted the affidavit of John Rayfield, a legislative staff member of the House Committee on Resources, who had custody of the maps referred to in § 220. Rayfield states:

> On or about the third week of September 1996, I sent by regular mail, without a cover letter, but in the usual manner of Committee mail in a mailing tube with a Committee label with a return address, copies of the final maps that are referred in Section 220 to the Arlington office of the Department of the Interior, Fish and Wildlife Service ("DOI"), so that these maps would be on file.

Rayfield aff. at 1 (Int.Opp.Ex. 3).

Notwithstanding Rayfield's statement that he sent the maps, it is undisputed that at this time, the DOI has not been able to locate these maps at its offices.

Following receipt of the maps from Congressman Young, DOI and FWS staff met with congressional staff to decipher the text and notes written on the maps. In February 1997, as FWS staff transferred the information from the congressional maps to the revised maps that would be published, FWS staff found inaccuracies in the scale used in the congressional maps as well as inconsistencies between lines drawn on the maps and text written on the maps. Letter from Rogers to Young on 3/3/97 (Pls.' Ex. E). Moreover, FWS found there was no title on the map ("map #8") depicting the area that § 220 refers to as Unit P32. *Id.*

In subsequent meetings in March and April 1997, FWS staff met with congressional staff to resolve remaining issues with the maps. In a meeting on April 7, 1997, congressional staff provided another map #8 to FWS staff. Defendants claim that although this newly furnished map #8 had the proper title referred to in § 220, the map otherwise had identical mapping information.

After a first attempt to publish notice of changes to the CBRS maps on April 29, 1997, which was withdrawn on April 30, 1997, due to a request for further meetings between DOI and congressional staff, DOI finally published notice of the completed map changes on May 28, 1997.

### III. Discussion

Summary judgment should be granted pursuant to Federal Rule of Civil Procedure 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C.Cir.1992). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran*, 517 F.2d

66, 67 (2d Cir.1975). The cross-motions for summary judgment pending before the Court present no genuinely disputed material facts that would preclude summary judgment.

Plaintiffs are challenging the changes that DOI made based on the maps it received from Congressman Young, post-enactment, on the ground that these were not the maps that were "on file" with DOI at the time Congress passed the amendment, and therefore that DOI's actions were unauthorized.

### A. Standing

█ As a threshold issue, the government contends that plaintiffs do not have standing to bring this claim. The elements of standing are injury, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The government contends that plaintiffs do not have standing because they cannot establish any of these three elements. This Court concludes, however, that plaintiffs have established standing to challenge the agency's action in this case.

█ As to the injury requirement, the government argues that because some development already exists on the land at issue in this case, the agency's actions cannot injure plaintiffs. Plaintiffs claim, however, that further development stemming from the agency's actions will affect their stated recreational, academic, and professional interests. *See, e.g.,* Witherington Aff. at 2 (stating that, as a research scientist and as a Florida resident, he has professional and personal interests in 6 of the 8 sites at issue) (Pls.' Ex. L); Stoll Aff. at 5–6 (stating that he studies endangered sea turtle nesting sites near the areas at issue and that the indirect effects of increased development, including artificial lighting, will be detrimental because of the impact of artificial light on turtle hatchlings; also stating that he engages in bird watching in one of the areas at issue, P05, and that increased development of that area will irreparably damage suitability of site for bird species in the area) (Pls.' Ex. M); Godfrey aff. at 3 (stating that increased development on area P10 will result in destruction of nesting habitat for loggerhead sea turtles

and green turtles) (Pls.' Ex. Q). This Court finds that plaintiffs' stated interests in preventing further development constitutes sufficient injury to meet the Article III injury requirements under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ Regarding causation, the government maintains that plaintiffs cannot establish a causal link between the agency's action and their alleged injuries. First, the government argues that because plaintiffs' true grievance is with the substance of § 220, rather than with the agency's implementation of § 220, plaintiffs cannot establish causation. Plaintiffs argument, however, is that because the agency's actions are unauthorized and because the agency decided which maps it would use in making corrections to the barriers, their injury is directly traceable to the agency's actions.

The government also argues on the causation element that plaintiffs cannot show that the map corrections will lead to development on particular parcels that will negatively affect the wildlife plaintiffs are seeking to protect. Plaintiffs point, however, to Congress' purpose in enacting CBRA, which explicitly recognized that including land in the CBRS would result in little or no development and would "minimize ... the damage to fish, wildlife, and other natural resources." 16 U.S.C. § 3501; H.R.Rep. 841, 97th Cong., 2d Sess., pt. 1, at 10–11 (1982) (finding that federal expenditures and financial assistance, including federal flood insurance, have had the effect of encouraging development of coastal barriers); *Florida Key Deer v. Stickney*, 864 F.Supp. 1222, 1225 (S.D.Fla.1994) (finding causal connection between availability of flood insurance and rate or amount of new development). The Court finds that plaintiffs have sufficiently shown, based on

the stated purposes of the CBRA, a causal link between the actions of the agency in making changes to the CBRS and plaintiffs' threatened injuries.

■ Finally, as to the redressability element of standing, intervenors contend that a decision finding the agency's actions unlawful would not redress plaintiffs' injuries because the agency would again be required to make the changes mandated by 220 and because there is no indication that the agency would do anything differently the next time. A conclusion by this Court, however, that the agency's actions were unauthorized and therefore unlawful because the agency relied on maps that were not on file, would prevent the agency from repeating its conduct by once again making changes to the CBRS on the basis of maps that were not on file with the Secretary at the time of enactment. Rather, to carry out the intent of § 220, the agency would be required to either locate the maps that were sent to it pre-enactment, or ask Congress to amend its statute. The Court thus finds that plaintiffs' threatened injuries are redressable by a decision of this Court. Furthermore, the Court concludes that plaintiffs have established all three elements of standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

### B. DOI's Actions

The specific language at issue is the requirement that the Secretary make changes to the CBRS "consistent with the depictions of areas appearing on the maps entitled 'Amendments to Coastal Barrier Resources System', dated November 1, 1995, and June 1, 1996, and *on file* with the Secretary." Pub.L. 104–333, § 220, 110 Stat. 4115 (1996) (emphasis added).[4] The controversy in this

---

4. The complete text of § 220 is as follows:

(a) In General.—The Secretary of the Interior shall, before the end of the 30–day period beginning on the date of the enactment of this Act, make such corrections to the maps described in subsection (b) as are necessary to ensure that depictions of areas on those maps are consistent with the depictions of areas appearing on the maps entitled "Amendments to Coastal Barrier Resources System", dated No-

vember 1, 1995, and June 1, 1996, and on file with the Secretary.
(b) Maps Described.—The maps described in this subsection are maps that—
(1) are included in a set of maps entitled "Coastal Barrier Resources System", dated October 24, 1990; and
(2) relate to the following units of the Coastal Barrier Resources System: P05, P10, P11, P11A, P18, P25, P32, and 232P.

case thus centers around the words "on file with the Secretary."

### 1. Were actions ministerial and therefore unreviewable?

Under the APA, a court must "hold unlawful or set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Agency action is defined as "the whole or part of an agency rule, order, license, sanction, relief or the equivalent, or denial thereof, or failure to act." 5 U.S.C. § 551(13).

As a threshold issue, the government argues that the actions of the DOI cannot be reviewed under the APA because they did not entail any decisionmaking by the agency, but rather were "ministerial" actions not subject to APA review.

Plaintiffs' position is that an APA claim is proper in this case because the agency in fact did *not* limit itself to the ministerial duties that Congress delegated to it through § 220. Rather, plaintiffs claim the agency acted *beyond* Congress' authorization in making changes to maps that the agency received post-enactment when the agency, in fact, did not have maps on file at the time of enactment. To support their position, plaintiffs point to the number of high-level agency officials involved in making the map changes, as well as the number of meetings held between agency and congressional staffs. Further, plaintiffs point to DOI documents stating that "technical, legal, and policy issues" were resolved in the course of meetings between agency and congressional staff regarding the map changes. (Pls.' Ex. T).

■ Considering the actions that the agency actually took with respect to the maps in trying to carry out the intent of Congress that the changes be made, this Court concludes that the agency's actions are subject to APA review because the agency's actions in fact went beyond the purely ministerial task assigned to it by Congress. A different conclusion would exempt an agency

from review when the task assigned to it is ministerial but the agency undertakes actions beyond those mandated by Congress.

### 2. Were the agency's actions arbitrary, capricious, or contrary to law?

In reviewing an agency's interpretation of a statute it is charged with administering, the Court must be guided by the framework of *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Halverson v. Slater*, 129 F.3d 180, 184 (D.C.Cir.1997). Under the *Chevron* two-step test, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. A court does not reach this second step "if a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. 2778.

Under step one of *Chevron*, the question before the Court is whether the "on file" language is clear. If Congress' intent is clear, then this Court's review must end there. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *Halverson*, 129 F.3d at 184.

Plaintiffs central argument is that, read in its common-sense meaning, "on file" means "on file" at the time of enactment of the legislation. The government and intervenors, on the other hand, present several arguments for why even a plain reading of "on file" supports their position that the agency acted properly in using maps received post-enactment to make changes to the CBRS.

First, the government argues that the "on file" language should be interpreted to mean that the Secretary should keep the maps on

Omnibus Parks and Public Lands Management Act of 1996, Pub.L. 104–333, § 220, 110 Stat. 4115.

file for public view, but not necessarily that the maps were required to be on file at the time of enactment. To support this interpretation, intervenors point to language in the 1990 amendment to the CBRS statute which requires the Secretary to keep CBRS maps "on file and available for public view." Pub.L. No. 101–591, § 4(b), 104 Stat. 2932 (1990), codified at 16 U.S.C. § 3503(b).[5] Intervenors argue that the "on file" language in § 220 should be read similarly to the language in § 3503(b).

■ The language intervenors cite, however, lends more support for plaintiffs' argument and for this Court's finding that in § 220, Congress meant the maps to be "on file" at the time of enactment. First, the language of § 3503(b) shows that if Congress had meant "on file" to mean "on file for public view" in the future, it could easily have written § 220 the same way as § 3503(b). Second, as is evident in reading the full text of § 3503, Congress specifically directed where the maps would be kept when it intended the "on file" requirement to be "on file" for public inspection.[6] In contrast, in § 220, Congress did not state that the maps on which the Secretary was to base changes to the CBRS should be kept for public inspection or where they should be kept for that purpose. Given the difference in language, and Congress' failure to mention where the maps should be kept for public inspection, this Court concludes that the "on file" language in § 220 should not be read the same way as the "on file" language in § 3503(b). The difference in the language Congress chose to use in § 220 supports this Court's finding that Congress meant the

maps to be "on file with the Secretary" at the time the statute was enacted.

Second, intervenors argue that the words on file with the Secretary can simply be interpreted to mean "on file" prior to implementation of the legislation. This reading, however, would be inconsistent with the agency's initial interpretation. When the agency first realized that it could not locate the maps, Jane Lyder, DOI's Acting Legislative Counsel, wrote to both Senator Chafee and Congressman Young to advise them of the fact that "the maps are not and never have been on file with the Secretary or with any other official in the Department." Letter from Lyder to Chafee, 12/4/96 (Pls.' Ex. A); Letter from Lyder to Young, 12/4/96 (Pls.' Ex. B). Lyder's letter suggests that the agency's own interpretation of "on file" was that it needed to have the maps on file at the time the statute was enacted. Furthermore, the Lyder letter states that "[i]f the Committee believes we are in error and that the maps were in fact transmitted to the Secretary, *and put on file,* please let us know to whom, and when the maps were delivered." *Id.* (emphasis added). Additional evidence of the agency's interpretation of "on file" appears in a letter from John Rogers, Acting Director of the FWS, to Congressman Young in which Rogers discussed the difficulties the FWS experienced in making changes to the CBRS maps. In his letter, Rogers states:

In the past when System maps were amended, Service and Congressional staff worked together closely prior to enactment to develop a legal description of the area to be modified or to draw new lines on base maps that would then be date stamped and

5. The full text of § 3503(b) is as follows:

The Secretary shall keep the maps referred to in subsection (a) of this section on file and available for public inspection in the Office of the Director of the United States Fish and Wildlife Service, and in such other offices as the Director considers appropriate.

16 U.S.C. § 3503(b).

6. Congress has often used the language "on file and available for public inspection" in statutes where maps effect boundary changes or establish national parks. *See, e.g.,* 16 U.S.C. § 157(c) (revising boundaries to Big Bend National Park and requiring that map "shall be on file and available

for public inspection at the local and Washington, District of Columbia, Offices of the National Park Service, Department of the Interior"); 16 U.S.C. § 410ee(a) (establishing San Antonio Missions National Historical Park and requiring that map "shall be on file and available for public inspection in the offices of the National Park Service, Department of the Interior, and in the offices of the Superintendent of the park"); 16 U.S.C. § 410gg (establishing Biscayne National Park and requiring that map "shall be on file and available for public inspection in the offices of the National Park Service, Department of the Interior").

referenced in legislation. If the legislatively referenced maps were to be maintained *on file with the Secretary,* those maps were officially transmitted from the Committee to the Department, and their receipt documented prior to the passage of the legislation. We hope you will agree that we need to ensure that such procedures are strictly followed in any future coastal barriers legislation so that we may avoid the types of problems described above.

*See* Letter from Rogers Young, 3/3/97, at 2 (emphasis added) (Pls.' Ex. E). Lyder's and Roger's letters conclusively show, this Court believes, that the agency's interpretation of the "on file" language is consistent with this Court's own interpretation, which is that Congress meant that the maps be on file at the time the statute was enacted.

Finally, intervenors argue that the on file language should be read in the same way that deadlines have been interpreted in environmental statutes. Intervenors attempt to analogize the "on file" language of § 220 to a statutorily imposed deadline. *See Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392, 1400 (9th Cir.1995) (stating that "failure of an agency to act within a statutory time frame does not bar subsequent agency action absent a specific indication that Congress intended the time frame to serve as a bar"). In *Idaho Farm Bureau Federation,* a statutorily imposed deadline on the FWS was not strictly enforced on the grounds that strict enforcement would thwart the purpose of the statute which was to list endangered species. *Id.* at 1400–01. Intervenors, however, fail to recognize the distinction between a deadline meant to prompt agency action and Congress' inclusion of the "on file" language as its way of more specifically identifying the maps that it intended the Secretary to use in making corrections to the CBRS.

■ In this case, the Court finds that Congress had an intention on the precise question at issue, that is, which maps should be referenced in making corrections to the Coastal Barrier Resource System, and further that Congress spoke clearly and plainly when it described the maps to be referenced as "on file with the Secretary." Given the finding that Congress spoke clearly on this issue, the Court cannot proceed to the second step of *Chevron* consider the reasonableness of the agency's actions in making changes based on maps that were not, in fact, on file. *See Halverson,* 129 F.3d at 184.

The government would nevertheless urge this Court to proceed to the second step of *Chevron* on the grounds that reading the statute plainly, that is, to mean that the maps needed to be on file with the agency at the time of enactment, leads to an absurd result. The government's position is that if plaintiffs succeed in this litigation, Congress' intent in passing § 220 will be frustrated because if DOI's actions are held to have been unlawful, then § 220 will have no effect. The government argues that this Court would thus improperly thwart Congress' intent by its reading of "on file" since the intent of Congress was to have corrections made to CBRS maps. Because this circuit has held that, on rare occasions, a court may disregard the plain language of a statute where it would produce an absurd result, this Court examines the government's argument that a strict reading of "on file with the Secretary" would lead to an absurd result. *See Environmental Defense Fund, Inc. v. EPA,* 82 F.3d 451, 468 (D.C.Cir.1996).

In determining whether the result of a strict reading of "on file" would be absurd, this Court considers what Congress' intent was in passing § 220. It is true that one intent of Congress was to have corrections made to the CBRS. However, an equally important intent of Congress, which the government overlooks, was also to have those corrections made on maps it specifically described as "on file with the Secretary." In § 220, reference to the maps was of central importance because Congress wanted to specify the maps it relied on precisely in order to have its true intent implemented. Although the government argues that § 220 identifies the maps by titles and dates, these maps went through a series of markups and versions prior to the passing of § 220. Tr. at 55–56. Therefore, reference simply to titles and dates might not sufficiently have described the maps that Congress meant. This Court can very reasonably conclude there-

fore that Congress intended to add a third identifier so that the corrections that Congress, as a full body, considered and passed, would be the changes ultimately made by the agency. Although the broad intent of § 220 was to make boundary changes to the CBRS, another important goal of the legislation was to precisely refer to the maps that the agency should use in making those changes.

This circuit has considered a case where giving effect to the plain meaning of a statute would detract from the broader congressional purpose. In *Natural Resources Defense Council v. Thomas*, 805 F.2d 410 (D.C.Cir. 1986), this circuit reviewed the actions of the EPA in implementing emission standards and concluded that the agency's action disregarded the plain meaning of the statute. *Id.* at 434. In shortening lead time for manufacturers to adopt new standards, the court found that the EPA disregarded the plain meaning of the statute which required a four-year lead time, even though the EPA's actions furthered "Congress' paramount goal of putting the standards into place as soon as possible." *Id.* at 436 n. 41. After reviewing the intent of the statute, the court in *Natural Resources* "[came] down on the side that courts are not entitled to substitute their broader reading of congressional intent for the plain language of the statute unless adherence to that plain language would bring about a patently absurd result." *Id.*

In the present case, the government and intervenors ask this Court to disregard a plain statutory command in order to, as they argue, further Congress' broader purpose. In this case, however, this Court is not inclined to disregard Congress' plain language for reasons similar to those noted by this circuit in *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C.Cir.1996). In *Indiana Michigan Power Co.*, this circuit addressed a section of the Nuclear Waste Policy Act which stated that "the services to be provided by the [Department of Energy] under this contract shall begin, after commencement of facility operations, not later than January 31, 1998." *Id.* at 1273. In that case, the DOE had determined that it did not have to abide by the January 31, 1998 date because it would not

be able to have a waste management facility in operation by that time. This circuit concluded that "[t]he Department's treatment of this statute is not an interpretation but a rewrite. It ... blue-pencils out the phrase 'not later than January 31, 1998,'.... It does not survive the first step of the Chevron analysis." *Id.* at 1276. Similarly, this Court concludes that the government's interpretation of § 220 would impermissibly read the words "on file" out of the statute.

Finally, the government argues that invalidating the agency's actions would render § 220 absurd and with no effect. The government's argument, however, ignores the fact that it is the actions of Congress and the agency that have led to the problems giving rise to this litigation. "The court's role is not to 'correct' the text so that it better serves the statute's purposes, for it is the function of the political branches not only to define the goals but also choose the means for reaching them." *Engine Mfr.'s Ass'n v. United States EPA*, 88 F.3d 1075, 1089 (D.C.Cir.1996). Also, it is noteworthy to consider that if, today, the maps forwarded to the agency pre-enactment were discovered in the agency's files, then § 220 would have the effect Congress meant it to have. Thus, it is not this Court's actions that frustrate Congress' intent to make boundary changes to the CBRS, but rather the unfortunate collection of circumstances that have led to this litigation.

## IV. Conclusion

This Court concludes that Congress spoke clearly and plainly when it described the maps on which the agency was to base changes to the CBRS. If following that plain language, an agency cannot carry out Congress' intent, then the remedy is not to distort or ignore Congress' words, but rather to ask Congress to address the problem.

Given this Court's conclusion that the DOI's actions in making changes to maps that were not on file with the agency at the time § 220 was enacted was unauthorized and in violation of § 220 and the APA, this Court does not reach plaintiffs' NEPA and ESA claims.

Accordingly, it is hereby

**ORDERED** that the Federal Emergency Management Agency is **DISMISSED** as a defendant in this case; and it is further

**ORDERED** that plaintiffs' motion for summary judgment is **GRANTED**; and it is further

**ORDERED** that defendants' motion for summary judgment is **DENIED**; and it is further

**ORDERED** that intervenors' motion for summary judgment is **DENIED**; and it is further

**ORDERED** that this case is **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk shall enter judgment for plaintiffs Coast Alliance, Center for Marine Conservation, Caribbean Conservation Corporation, Dr. Blair Witherington, Dr. Robert Stoll, Dr. Deborah Crouse, Dr. John K. Mahon, and Christine Perretta, and against defendants Bruce Babbitt, Secretary Department of the Interior, and John Rogers, Acting Director, United States Fish and Wildlife Service.