# Authority of the Bureau of Alcohol, Tobacco, Firearms, and Explosives to Permit Importation of Frames, Receivers, and Barrels of Non-Importable Firearms

The Bureau of Alcohol, Tobacco, Firearms, and Explosives does not have authority under the Gun Control Act of 1968 to permit the importation of the frames, receivers, and barrels of non-importable firearms, where the importation of those parts is solely for purposes of repair or replacement rather than for the assembly of a new firearm.

The Bureau may, however, announce that, for a limited time (60 days), it will not take enforcement action against persons importing frames, receivers, or barrels pursuant to a previously issued permit.

July 6, 2005

MEMORANDUM OPINION FOR THE DIRECTOR
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

You asked for our opinion whether the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or "Bureau") has the authority to permit the importation of the frames, receivers, and barrels of non-importable firearms, where the importation of those parts is solely for purposes of repair or replacement rather than for the assembly of a new firearm. *See* Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Carl J. Truscott, Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives (July 1, 2005). We conclude that ATF does not have such authority. Having been made aware of this conclusion, you also have asked whether it would be permissible for ATF to announce that, for a limited time (60 days), it will not take enforcement action against persons importing frames, receivers, or barrels pursuant to a previously issued permit. We conclude that, under these circumstances, a temporary policy of non-enforcement against those acting in good-faith reliance on ATF permits would represent a reasonable exercise of the Bureau's enforcement discretion.

## I.

The Gun Control Act of 1968, as amended, broadly restricts the importation of firearms into the United States. *See* 18 U.S.C. § 922 (2000 & Supp. V 2005). However, the Act makes an exception for firearms that are "generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms." *Id*. § 925(d)(3) (Supp. V 2005). (In addition, to come within this exception, the weapon must fall outside the definition of "firearm" in 26 U.S.C. § 5845 (2000).) Because Congress did not define "sporting purposes," that authority passed to ATF, which, over the years, has classified an increasingly wide variety of firearms—including various kinds of semi-automatic rifles—as not suitable for sporting purposes and thus subject to section 925(d)(3)'s import prohibition. In 1986, as part of the Firearms Owners' Protection Act, Pub. L. No.

99-308, § 105(2)(C), 100 Stat. 449, 459 (1986), Congress amended section 925(d)(3) to provide that "in any case where the Attorney General[1] has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled." Since 2001, however, ATF has continued to allow the importation of frames, receivers, and barrels of non-importable firearms, albeit only for the repair or replacement of the corresponding parts of firearms that are already in the country. To that end, the Bureau has issued permits authorizing importers to bring such parts into the United States for that purpose. This exception has allowed owners of machine guns, surplus military firearms, and nonsporting firearms to acquire parts needed to repair firearms they lawfully acquired and lawfully possess.

We have now determined that ATF's practice is not authorized by the statute. Our conclusion is compelled by the unambiguous language of section 925(d)(3). *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 356 (1994) ("When interpreting a statute, we look first and foremost to its text."). The language added by the Firearm Owners' Protection Act is clear. It addresses "any" case in which a firearm is non-importable because it has been deemed to fall outside of the "sporting purposes" exception. Within that category of weapons, the statute mandates that "it shall be unlawful to import *any* frame, receiver, or barrel of such firearm which would be prohibited if assembled." 18 U.S.C. § 925(d)(3) (emphasis added). "Any" is a word that in ordinary usage is understood to have an "expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5 (1997). Read naturally, therefore, section 925(d)(3) bars the importation of every frame, receiver, or barrel of every firearm that comes within its scope and admits of no exceptions to that comprehensive ban. *Cf. Brogan v. United States*, 522 U.S. 398 (1998) (refusing to read into a statutory prohibition on "any false statement" an implied limitation for the mere denial of wrongdoing).

Although we recognize that the word "any" is not invariably as expansive as its ordinary meaning suggests, *see Small v. United States*, 544 U.S. 385 (2005) (holding that "any court" as used in 18 U.S.C. § 922(g)(1) did not include foreign courts), we find no textual or contextual indications that—as used in section 925(d)(3)—the term admits of any implicit exception. Indeed, the situation here is far different from the one that confronted the Supreme Court in *Small*, where the phrase "any court" had to be read against a general presumption that Congress legislates with domestic concerns in mind. 544 U.S. at 388–89. That presumption

---

[1] The Attorney General has delegated his statutory authority under chapter 44 of title 18 (which includes sections 922 and 925) to ATF. *See* 28 C.F.R. § 0.130(a)(1) (2004); *cf.* 28 U.S.C. § 510 (2000) (allowing the Attorney General to "make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General").

created at least some reason to doubt that the statute necessarily covered foreign convictions. In addition, the Court identified important differences between the two categories of convictions, which would have been indiscriminately conflated if "any" were interpreted broadly. *Id*. at 389–90. Finally, the Court noted that reading the statute to include foreign courts would introduce anomalies that Congress was unlikely to have expected or intended. *Id*. at 391–92.

Here, in contrast, there are no background principles of statutory construction that would ordinarily work to distinguish parts used for replacement from parts used for any other purpose. In this context, affording "any" its natural sweep would not implicate concerns about extraterritoriality, federalism,[2] constitutionality,[3] or any other concern that would support reading otherwise-broad statutory language narrowly. And, whereas in *Small*, it was plausible to think that the use of the phrase "any court" in a federal statute might be limited to courts within the purview of Congress (i.e. domestic courts), here there is simply no linguistic context, be it casual conversation or federal legislation, where "any frame, receiver, or barrel . . . which would be prohibited if assembled" can be read to leave out a subset of frames, receivers, or barrels of a prohibited firearm. Nor are we aware of any relevant context from the time of section 925(d)(3)'s amendment that would suggest giving special treatment to replacement parts so as to exempt them from the statute's seemingly general prohibition.

Finally, no absurd or even anomalous results would flow from interpreting the statute to mean what it says. It is perfectly reasonable for Congress to have wanted to bar the importation of all frames, receivers, and barrels of firearms that could not be imported if fully assembled, rather than merely those frames, receivers, and barrels that were to be used for purposes other than repair or replacement. Indeed, insofar as one purpose of the import ban was to reduce over time the number of non-sporting firearms in the United States that could be put to illicit ends, ATF's implied exception, which would allow such weapons to be continually reconstituted from imported parts, would seem to frustrate that purpose. Of course, if Congress had intended for section 925(d)(3) to include a repair or replacement exception, it could have enacted one. Because it did not, and because nothing inconsistent with the statutory purpose would occur in the absence of such an exception, we are not free to read into the statute a limitation that does not appear in its text.

Nor may ATF invoke its general regulatory authority to engraft a repair or replacement exception onto the statute's blanket importation ban. Although the

---

[2] *E.g.*, *Nixon v. Mo. Municipal League*, 541 U.S. 125 (2004) (refusing to adopt a broad reading of "any entity" where doing so would have resulted in federal interference in the relationship between states and their political subdivisions).

[3] *E.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (discussing and applying the constitutional avoidance canon).

Bureau has rulemaking authority with respect to the federal firearms laws, *see* 18 U.S.C. § 926 (2000 & Supp. V 2005), that authority cannot be used to undermine an unambiguous statutory command. An agency may not rewrite a statute in the guise of interpreting it. *See, e.g.*, *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996). More specifically, a general grant of rulemaking authority does not confer on an agency the power to create exceptions from the plain language of a statute. *See, e.g.*, *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1372 (D.C. Cir. 1977) (holding that where a statute required permits for pollution discharges from "any point source," EPA lacked the power to exempt certain categories of point sources from that requirement).[4] Indeed, it is a cardinal rule of administrative law that where "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467. U.S. 837, 842-43 (1984).

Here, as discussed above, the text of section 925(d(3) speaks "to the precise question at issue," thus foreclosing the agency from making a different choice. *Chevron*, 467 U.S. at 842. Congress has banned the importation of all frames, receivers, and barrels of all firearms that ATF has classified as not suited for sport, as well as those parts of all surplus military firearms and all "firearms" as defined in 26 U.S.C. § 5845. The statute leaves no gap to be filled and therefore delegates no policy judgment to ATF about whether to allow such imports for particular purposes. *Accord Nat'l Cable & Telecomm. Ass'n v. Brand X Internet*, 545 U.S. 967, 980–81 (2005). ATF cannot "pry apart the clear words of the act in order to create a gap into which it can wedge its policy preference." *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791,797 (11th Cir. 2000). In sum, then, because a repair or replacement exception "goes beyond the meaning that the statute can bear," *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994), recognizing such an exception represents an impermissible use of ATF's regulatory power. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) ("The inquiry ceases if 'the statutory language is unambiguous and the statutory scheme is coherent and consistent.'") (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

## II.

Our conclusion that ATF lacks the statutory authority to issue permits for the importation of frames, receivers, and barrels for repair or replacement means, of

---

[4] More recently, the Ninth Circuit followed *Costle* when it rejected the EPA's similar attempt to "exempt from NPDES permit requirements that which clearly meets the statutory definition of a point source by 'defining' it as a non-point source. Allowing the EPA to contravene the intent of Congress, by simply substituting the word 'define' for the word 'exempt,' would turn *Costle* on its head." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1190 (9th Cir. 2002).

course, that ATF must stop granting applications for such permits. You have advised us that you have already done so. We are aware, however, that importers who already hold permits issued by ATF may well suffer considerable economic hardship if those permits were invalidated and their operations immediately shut down. Those importers acted in good-faith reliance on the Bureau's erroneous conclusion that it possessed the legal authority to recognize a repair or replacement exception. Possessing what they reasonably believed were valid permits, those importers entered into binding contracts with foreign suppliers and made investments that would likely be unrecoverable if all importations were stopped suddenly and without warning. Indeed, parts may be in transit to the United States now.

In an effort to alleviate this potential unfairness, you have asked whether, for a limited period of time, ATF may refrain from taking enforcement action against current permit-holders who continue to import frames, receivers, or barrels in accordance with the terms of their permits. We understand that ATF will achieve this result by notifying Customs and Border Protection that—as of 60 days from the date on which ATF notifies industry of its new policy—repair or replacement permits should no longer be accepted to release the frames, receivers, and barrels of non-importable firearms into the United States. Under these circumstances, we believe that this approach would be a permissible exercise of ATF's enforcement discretion.

The Supreme Court has recognized that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *cf. United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."); *Vaca v. Sipes*, 386 U.S. 171, 182 (1967) (recognizing that the NLRB has "unreviewable discretion to refuse to institute an unfair labor practice complaint"). This is so because an agency's decision about whether to enforce the laws over which it has jurisdiction "involves a complicated balancing of a numbers of factors which are peculiarly within its expertise." *Heckler*, 470 U.S. at 831. These factors include how best to spend agency resources; the agency's likelihood of success if it decides to enforce; whether the particular enforcement action fits within the agency's overall policies; and, to some extent, concerns for individual liberty and property rights, which may be implicated when the agency acts, but usually not when the agency declines to act. *Id*. at 831–32; *see also Wayte v. United States*, 470 U.S. 598, 607–08 (1985).

ATF is entitled to balance these considerations to assure existing permit-holders that, for a short time, no enforcement action will be taken against them. It would be difficult to gainsay ATF's conclusion that its limited resources are best not spent enforcing the ban against importers for taking action that the Bureau had specifically authorized them to take. Moreover, it is entirely appropriate for an

agency to rely on equitable considerations in deciding when to bring an enforcement action and against whom. *Cf. Interim Designation of Acceptable Documents for Employment Verification*, 62 Fed. Reg. 51001, 51001–02 (Sept. 30, 1997) ("[I]n order to minimize confusion and disruption, [INS] will exercise its discretion to forego enforcement actions against employers who continue to act in reliance upon and in compliance with existing employment verification forms, guidance, and procedures."). Here, given that existing permit-holders acted reasonably in structuring their businesses and making contracts on the assumption that the permits were valid, those considerations are particularly compelling.

We emphasize that we are not suggesting that ATF (or any other federal agency) may use its enforcement discretion simply to allow or encourage private parties to flout statutory bans. Rather, we believe that the unusual circumstances now presented—where ATF's misapprehension of its authority induced reasonable reliance on the part of regulated parties—allow ATF to set aside a limited period during which it will decline to visit the consequences of its own legal error upon those who would otherwise endure significant financial hardship. By merely delaying enforcement, ATF is not suggesting that the statutory ban on importation does not merit enforcement. Once the 60-day window closes, no further importations will be allowed, and anyone who subsequently violates section 925(d)(3) will be subject to punishment, whether or not he previously had a permit. In the meantime, however, that window represents an appropriate compromise between ATF's important obligation to enforce the law in an evenhanded manner and its desire not to impose the costs of its mistakes on those who relied in good faith upon them.

### III.

For these reasons, we conclude that although ATF lacks the statutory authority to grant permits for the importation of frames, receivers, and barrels of non-importable firearms, the Bureau may exercise its discretion not to bring enforcement proceedings against individuals who, for a limited time, continue to import such parts in good-faith reliance on previously issued importation permits.

STEVEN G. BRADBURY
*Acting Assistant Attorney General*
*Office of Legal Counsel*