IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2006 Session

## MIDWESTERN GAS TRANSMISSION COMPANY v. JAMES R. STEPHENSON ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 26446-C     C. L. Rogers, Judge**

**No. M2005-00826-COA-R3-CV - Filed February 24, 2006**

This appeal is one of twenty-seven similar appeals arising from a dispute between a natural gas company that has the power of eminent domain and the owners of twenty-seven properties who are resisting the company's efforts to construct an extension of an existing pipeline. After these property owners refused to permit the company to conduct preliminary examinations and surveys on their properties, the company filed separate complaints against the owners of each tract in the Circuit Court for Sumner County seeking orders authorizing it to conduct the preliminary examinations and surveys necessary for the siting of the project pursuant to Tenn. Code Ann. § 29-16-121 (2000). The trial court conducted an expedited joint hearing and entered an order dismissing the company's complaints. The company appealed, and we consolidated the cases for oral argument. We have concluded that Tenn. Code Ann. § 29-16-121 is not preempted by the Natural Gas Act and that the company is entitled to the orders of preliminary entry it sought. Accordingly, we have determined that the trial court erred by dismissing the company's complaints.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Lela M. Hollabaugh and Michael S. Mizell, Nashville, Tennessee, for the appellant, Midwestern Gas Transmission Company.

Frank M. Fly, Murfreesboro, Tennessee, and Gary Allen Davis, Hot Springs, North Carolina, for the appellees, James R. Stephenson and Debbie Stephenson.

## OPINION

### I.

The Midwestern Gas Transmission Company (Midwestern) plans to construct and operate a natural gas pipeline approximately thirty miles long beginning at its Portland Station in Sumner

County and running southeast to proposed interconnects in Trousdale County with pipelines owned and operated by Columbia Gulf Transmission Company and East Tennessee Natural Gas Company.[1] Before commencing construction, Midwestern must determine the precise location of the pipeline, acquire the necessary easements, and obtain a certificate of public convenience and necessity from the Federal Energy Regulatory Commission (FERC).

In order to make a final decision regarding the pipeline's location, Midwestern began contacting the owners of the potentially affected properties to obtain their permission to conduct preliminary examinations and surveys. While many of the affected property owners gave their permission, others did not. Accordingly, on January 7, 2005, Midwestern filed twenty-nine separate complaints in the Circuit Court for Sumner County against the owners of twenty-nine properties located along the path of the proposed pipeline.[2] Midwestern alleged in these complaints that it was entitled to conduct preliminary examinations and surveys under Tenn. Code Ann. § 29-16-121 (2000) and that it had attempted unsuccessfully to obtain temporary rights of entry on these properties. Accordingly, Midwestern requested the trial court to enter orders granting it access to the properties to conduct the preliminary examinations and surveys authorized by Tenn. Code Ann. § 29-16-121.

On January 25, 2005, Midwestern requested the trial court to grant an expedited hearing on its request for orders granting it access to the properties under Tenn. Code Ann. § 29-16-121.[3] Midwestern explained in these motions that the proposed pipeline project would cross 157 separate tracts of property in Sumner and Trousdale Counties and that the project could not move forward until preliminary examinations and surveys of all the properties along the proposed route could be obtained. Midwestern acknowledged that once the route of the pipeline was finalized, it would be required to obtain easements across the affected properties either by entering into agreements with the property owners or, if necessary, by filing condemnation proceedings against the properties and paying the property owners just compensation for the easements.

Midwestern's motions also stated that if the preliminary examinations and surveys indicated that a particular property was not suitable for inclusion in the project, it would reroute the pipeline and would have no need to commence condemnation proceedings against the unsuitable properties. Midwestern pointed out that if it could not obtain a right of temporary entry to the properties along the proposed route to conduct the requisite examinations and surveys, it would be required to file

---

[1]*See* Midwestern Gas Transmission Company; Notice of Intent to Prepare an Environmental Assessment for the Proposed MGT Eastern Extension Project, Request for Comments on Environmental Issues, and Notice of Public Scoping, 70 Fed. Reg. 4837-02 (Jan. 21, 2005).

[2]Midwestern filed similar complaints in the Circuit Court for Trousdale County against the owners of properties along the proposed route in Trousdale County. After the trial court dismissed the complaints filed in Sumner County, Midwestern voluntarily dismissed its Trousdale County complaints pending the outcome of this appeal.

[3]Midwestern's desire for an expedited hearing stemmed from its aggressive timetable for completing the pipeline project. In preliminary filings with FERC, Midwestern stated that it intended to file a formal application for a certificate of public convenience and necessity in May 2005, that it desired to begin construction of the pipeline in June 2006, and that it intended to complete the project in November 2006.

condemnation proceedings against all potentially affected properties without knowing whether these properties were even suitable for the construction and maintenance of a natural gas pipeline. According to Midwestern, this option would result in takings of private property that might ultimately prove unnecessary for the final project.

The owners of twenty-two of the parcels retained the same law firm and, on February 9, 2005, filed answers admitting the factual allegations in Midwestern's complaints but denying that Midwestern was entitled to conduct preliminary examinations and surveys on their property without their consent.[4] These property owners also requested the trial court to dismiss Midwestern's complaints or, in the alternative to include language in the orders authorizing the preliminary entries that would limit Midwestern's activities on the properties to the following: (1) walking on the property; (2) cutting brush or weeds to allow a line of sight with compensation for any damages; (3) driving stakes to identify the proposed route; (4) walking through the property and taking shallow soil samples for environmental, biological, and archaeological reviews; and (5) taking soil corings near major water crossings and at proposed meter sites.

The owners of another parcel retained another lawyer who filed separate pleadings.[5] The owners of the six remaining parcels did not retain counsel. In five of these six cases, the property

---

[4]The twenty-two cases in which answers were filed admitting the factual allegations of Midwestern's complaints are styled as follows: (1) *Midwestern Gas Transmission Co. v. Camilla Jean Palmer Revocable Living Trust*, No. M2005-00789-COA-R3-CV; (2) *Midwestern Gas Transmission Co. v. Larry Law et al.*, No. M2005-00790-COA-R3-CV; (3) *Midwestern Gas Transmission Co. v. Harold B. Knight et al.*, No. M2005-00791-COA-R3-CV; (4) *Midwestern Gas Transmission Co. v. Ruth W. Briley*, No. M2005-00792-COA-R3-CV; (5) *Midwestern Gas Transmission Co. v. Martha Jo Law Fenimore*, No. M2005-00793-COA-R3-CV; (6) *Midwestern Gas Transmission Co. v. Calvin Kirkham et al.*, No. M2005-00795-COA-R3-CV; (7) *Midwestern Gas Transmission Co. v. David Smith et al.*, No. M2005-00799-COA-R3-CV; (8) *Midwestern Gas Transmission Co. v. William Sherron et al.*, No. M2005-00800-COA-R3-CV; (9) *Midwestern Gas Transmission Co. v. Frank A. Bass et al.*, No. M2005-00801-COA-R3-CV; (10) *Midwestern Gas Transmission Co. v. T. David Barker, Sr. et al.*, No. M2005-00802-COA-R3-CV; (11) *Midwestern Gas Transmission Co. v. Denver L. Pryor*, No. M2005-00803-COA-R3-CV; (12) *Midwestern Gas Transmission Co. v. Lorrie Marcum*, No. M2005-00804-COA-R3-CV; (13) *Midwestern Gas Transmission Co. v. Linda Scott Webster*, No. M2005-00818-COA-R3-CV; (14) *Midwestern Gas Transmission Co. v. Nikki Wallace et al.*, No. M2005-00819-COA-R3-CV; (15) *Midwestern Gas Transmission Co. v. Berton Gregory et al.*, No. M2005-00820-COA-R3-CV; (16) *Midwestern Gas Transmission Co. v. Fred Thomas McKee et al.*, No. M2005-00823-COA-R3-CV; (17) *Midwestern Gas Transmission Co. v. Charles Carter et al.*, No. M2005-00825-COA-R3-CV; (18) *Midwestern Gas Transmission Co. v. James R. Stephenson et al.*, No. M2005-00826-COA-R3-CV; (19) *Midwestern Gas Transmission Co. v. Michael Rippy et al.*, No. M2005-00828-COA-R3-CV; (20) *Midwestern Gas Transmission Co. v. James Lassiter et al.*, No. M2005-00829-COA-R3-CV; (21) *Midwestern Gas Transmission Co. v. Rebecca Warren*, No. M2005-00830-COA-R3-CV; and (22) *Midwestern Gas Transmission Co. v. Charles A. Deshler & Martha A. Deshler Joint Caring Trust*, No. M2005-00831-COA-R3-CV.

[5]This case was appealed along with the others, but the case was remanded to the trial court after the parties agreed to dismiss the appeal in accordance with Tenn. R. App. P. 15 for reasons unique to the case. *Midwestern Gas Transmission Co. v. Robert T. McFadden et al.*, No. M2005-00821-COA-R3-CV (Stipulation of Voluntary Dismissal filed May 9, 2005). The trial court subsequently entered a final order applicable to that case alone, and Midwestern has again appealed the trial court's decision. *Midwestern Gas Transmission Co. v. Robert T. McFadden et al.*, No. M2005-02831-COA-R3-CV.

owners did not file answers to Midwestern's complaints.[6] In the remaining case, the property owners filed a pro se answer that neither admitted nor denied the factual allegations contained in Midwestern's complaint.[7]

On February 22, 2005, the trial court held an expedited joint hearing in all the pending Sumner County cases. No proof was presented, and at the conclusion of the hearing, the trial court announced that it would deny Midwestern's motions. On March 3, 2005, the trial court filed an order applicable to all the pending Sumner County cases in which it concluded that Tenn. Code Ann. § 29-16-121 does not authorize companies like Midwestern to enter private property without the owner's consent to conduct preliminary examinations and surveys prior to the filing of a condemnation complaint against the property. The court further concluded that even if Tenn. Code Ann. § 29-16-121 authorized a right of preliminary entry prior to the initiation of condemnation proceedings, Midwestern had presented no proof that it satisfied the factual prerequisites for exercising this authority. Accordingly, the trial court denied Midwestern's motions. Without explanation, the trial court took the further step of dismissing Midwestern's complaints. Midwestern appealed.[8]

On May 13, 2005, the property owners filed a Tenn. R. App. P. 16(b) motion to consolidate the appeals. Midwestern responded on May 20, 2005 that it did not oppose consolidation as long as the appeals were consolidated into three groups based on whether the defendant property owners had filed an answer admitting the factual allegations of the complaints, had filed an answer neither admitting nor denying the allegations, or had filed no answer to the complaint at all. On May 25, 2005, this court entered an order consolidating the appeals for the purpose of oral argument only and allowing the parties to file consolidated briefs if they wished to do so. The property owners in twenty-three cases filed a consolidated brief to which Midwestern replied.[9] The property owners in the other four appeals did not file briefs or otherwise participate in the January 11, 2006 oral argument before this court.

---

[6]The five cases in which answers were not filed are styled as follows: (1) *Midwestern Gas Transmission Co. v. Patricia G. Green*, No. M2005-00796-COA-R3-CV; (2) *Midwestern Gas Transmission Co. v. Rufus Reese et al.*, No. M2005-00805-COA-R3-CV; (3) *Midwestern Gas Transmission Co. v. Fred P. Walter et al.*, No. M2005-00822-COA-R3-CV; (4) *Midwestern Gas Transmission Co. v. Robert G. Ingrum et al.*, No. M2005-00827-COA-R3-CV; and (5) *Midwestern Gas Transmission Co. v. Kyle Dorris et al.*, No. 26450-C. The last of these cases was not appealed.

[7]*Midwestern Gas Transmission Co. v. Ronald R. Dunn et al.*, No. M2005-00824-COA-R3-CV.

[8]Even though Midwestern originally filed twenty-nine cases in Sumner County, these appeals involve only twenty-seven cases. Following the entry of the trial court's March 3, 2005 order, Midwestern reached an agreement with the owners of one of the parcels, and that case was not appealed. *Midwestern Gas Transmission Co. v. Kyle Dorris et al.*, No. 26450-C. The other case is the subject of a separate appeal. *Midwestern Gas Transmission Co. v. Robert T. McFadden et al.*, No. M2005-02831-COA-R3-CV.

[9]After the entry of the March 3, 2005 order, the owners of one of the properties who had not retained counsel or participated in the proceedings in the trial court retained the attorney who had been representing the owners of twenty-two of the properties in the trial court to represent them on appeal as well. *Midwestern Gas Transmission Co. v. Rufus Reese et al.*, No. M2005-00805-COA-R3-CV.

## II.
### THE RIGHT OF PRELIMINARY ENTRY UNDER STATE LAW

The parties' disagreement centers around the proper interpretation of the statutory condemnation procedures codified at Tenn. Code Ann. §§ 29-16-101 to -127 (2000 & Supp. 2005) and Tenn. Code Ann. § 29-16-121 in particular. Midwestern claims that the plain language of Tenn. Code Ann. § 29-16-121 authorizes it to enter the affected properties without the owners' consent to conduct the preliminary examinations and surveys necessary to determine whether the properties are suitable for inclusion in its proposed pipeline extension project. The property owners contend that Tenn. Code Ann. § 29-16-121 does not convey a right of preliminary entry at all, and that even if it does, the right of entry arises only after condemnation complaints have been filed against the properties. Accordingly, we must examine the statutory condemnation procedures codified at Tenn. Code Ann. §§ 29-16-101 to -127.

### A.

The responsibility for determining what a statute means rests with the courts. *Roseman v. Roseman*, 890 S.W.2d 27, 29 (Tenn. 1994); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 601 (Tenn. Ct. App. 1999). We must ascertain and then give the fullest possible effect to the General Assembly's purpose in enacting the statute as reflected in the statute's language. *Stewart v. State*, 33 S.W.3d 785, 790-91 (Tenn. 2000); *Lavin v. Jordon*, 16 S.W.3d 362, 365 (Tenn. 2000). In doing so, we must avoid constructions that unduly expand or restrict the statute's application. *Watt v. Lumbermens Mut. Cas. Ins. Co.*, 62 S.W.3d 123, 127-28 (Tenn. 2001); *Patterson v. Tenn. Dep't of Labor & Workforce Dev.*, 60 S.W.3d 60, 64 (Tenn. 2001); *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83 (Tenn. 2001). Our goal is to construe a statute in a way that avoids conflict and facilitates the harmonious operation of the law. *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001); *LensCrafters, Inc. v. Sundquist*, 33 S.W.3d 772, 777 (Tenn. 2000).

Our construction of a statute is more likely to conform with the General Assembly's purpose if we approach the statute presuming that the General Assembly chose its words purposely and deliberately, *Tidwell v. Servomation-Willoughby Co.*, 483 S.W.2d 98, 100 (Tenn. 1972); *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 151 (Tenn. Ct. App. 2001), and that the words chosen by the General Assembly convey the meaning the General Assembly intended them to convey, *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d at 83; *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997). Thus, we must construe statutes as we find them, *Jackson v. Jackson*, 186 Tenn. 337, 342, 210 S.W.2d 332, 334 (1948); *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946, 954 (Tenn. Ct. App. 1995), and our search for a statute's purpose must begin with the words of the statute itself, *Blankenship v. Estate of Bain*, 5 S.W.3d 647, 651 (Tenn. 1999); *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 754 (Tenn. Ct. App. 2001).

We must give a statute's words their natural and ordinary meaning unless the context in which they are used requires otherwise. *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d at 928; *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn. 2000); *State v. Fitz*, 19 S.W.3d 213, 216 (Tenn. 2000). Because words are known by the company they keep, *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d at 754, we should construe the words in a statute in the context of the entire statute and in light of the statute's general purpose, *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn. 1994); *Wachovia Bank of N.C., N.A. v. Johnson*, 26 S.W.3d 621, 624 (Tenn. Ct. App. 2000). When the meaning of statutory language is clear, we must interpret it as written, *Kradel v. Piper Indus., Inc.*, 60 S.W.3d 744, 749 (Tenn. 2001); *ATS Southeast, Inc. v. Carrier Corp.*, 18 S.W.3d 626, 629-30 (Tenn. 2000), rather than using the tools of construction to give the statute another meaning, *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d at 83; *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000).

Statutes, however, are not always free from ambiguity. When we encounter ambiguous statutory language – language that can reasonably have more than one meaning[10] – we must look to the entire statute, the entire statutory scheme in which the statute appears, and elsewhere to ascertain the General Assembly's intent and purpose. *State v. Walls*, 62 S.W.3d 119, 121 (Tenn. 2001); *State v. McKnight*, 51 S.W.3d 559, 566 (Tenn. 2001). One of the sources that we frequently look to for guidance is the statute's legislative history. *Bowden v. Memphis Bd. of Educ.*, 29 S.W.3d 462, 465 (Tenn. 2000); *Hathaway v. First Family Fin. Servs., Inc.*, 1 S.W.3d 634, 640 (Tenn. 1999); *Reeves-Sain Med., Inc. v. BlueCross BlueShield of Tenn.*, 40 S.W.3d 503, 507 (Tenn. Ct. App. 2000). We must be cautious about consulting legislative history. *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 673. A statute's meaning must be grounded in its text. Thus, comments made during the General Assembly's debates cannot provide a basis for a construction that is not rooted in the statute's text. *D. Canale & Co. v. Celauro*, 765 S.W.2d 736, 738 (Tenn. 1989); *Townes v. Sunbeam Oster Co.*, 50 S.W.3d 446, 453 n.6 (Tenn. Ct. App. 2001). When a statute's text and the comments made during a legislative debate diverge, the text controls. *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 674.

The tasks of statutory construction and applying a statute to a particular set of facts involve questions of law rather than questions of fact. *Patterson v. Tenn. Dep't of Labor & Workforce Dev.*, 60 S.W.3d at 62; *State v. McKnight*, 51 S.W.3d at 562; *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998). Accordingly, appellate courts must review a trial court's construction of a statute or application of a statute to a particular set of facts de novo without a presumption of correctness. *State v. Walls*, 62 S.W.3d at 121; *Hill v. City of Germantown*, 31 S.W.3d 234, 237 (Tenn. 2000); *Mooney v. Sneed*, 30 S.W.3d at 306.

---

[10] *LeTellier v. LeTellier*, 40 S.W.3d 490, 498 (Tenn. 2001); *Bryant v. HCA Health Servs. of N. Tenn., Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000).

## B.

The condemnation procedures codified at Tenn. Code Ann. §§ 29-16-101 to -127 originated as part of the Code of 1858.[11]  Code of 1858 §§ 1325-1348.  They appeared together in the chapter of the 1858 Code entitled, "Of [T]aking [P]rivate Property for Works of Internal Improvement." Code of 1858 §§ 1325-1348.  In compiling this chapter, the General Assembly relied primarily on Iowa's statutory condemnation procedures and several early Tennessee statutes conferring the power of eminent domain on particular companies or groups of individuals for the construction of works of internal improvement such as railroads and paved roads.[12]  There have been few changes to the statutory scheme since its original enactment in 1858.  Thus, aside from the addition of a handful of new provisions over the past 148 years[13] and some inconsequential changes in wording, the procedural framework for condemnation proceedings enacted by the General Assembly in 1858 remains in effect today.

The statutory condemnation scheme is primarily procedural in nature.  With one exception, it does not purport to confer the power of eminent domain on anyone.[14]  It merely prescribes procedures for the exercise of this power by entities on whom the General Assembly has otherwise conferred it.  The first few sections explain the reach of the legislative scheme.  Tenn. Code Ann. §§ 29-16-101, -102(a), -103.  The next few sections specify the contents of a condemnation complaint, the court in which a condemnation proceeding must be filed, and the manner in which notice of the proceedings must be provided to interested parties.  Tenn. Code Ann. §§ 29-16-104 to -106.  The bulk of the statutory scheme relates to the procedures for empaneling juries to decide the amount of compensation due and how the amount of compensation is to be calculated.  Tenn. Code Ann. §§ 29-16-107 to -120.

The remaining sections relate to the right of companies with the power of eminent domain to enter private property to conduct preliminary examinations and surveys, a prohibition against actually occupying property without first paying the compensation set by the jury, the right of property owners to file complaints for inverse condemnation where their property has been taken

---

[11]The Code of Tennessee (Return J. Meigs & William F. Cooper, eds., E.G. Eastman & Co. 1858) (Code of 1858); *see also* Act of Mar. 20, 1858, ch. 177, § 1, 1857-58 Tenn. Priv. Acts 411.

[12]This chapter of the Code of 1858 was carried forward, with citing references, in Shannon's Code of 1896. Shannon's Code, tit. 8, ch. 9, §§ 1844-1867 (citing Iowa Code of 1851 §§ 759-60, 763, 768, 771-72, 775, 778; Act of Feb. 22, 1856, ch. 132, §§ 10-11, 1855-56 Tenn. Pub. Acts 190, 192; Act of Jan. 10, 1854, ch. 90, § 14, 1853-54 Tenn. Pub. Acts 164, 167; Act of Feb. 7, 1850, ch. 72, §§ 5, 9, 1849-50 Tenn. Pub. Acts 229, 230-32; Act of Dec. 11, 1845, ch. 1, § 24, 1845-46 Tenn. Pub. Acts 17, 23-24); *see also* Act of Jan. 22, 1852, ch. 74, § 23, 1851-52 Tenn. Pub. Acts 82, 87-89; Act of Jan. 7, 1830, ch. 70, § 1, 1829-30 Tenn. Pub. Acts 98, 98-99; Act of Oct. 31, 1825, ch. 17, 1825 Tenn. Pub. Acts 13, 13-14; Act of Aug. 4, 1804, ch. 1, § 19, 2 EDWARD SCOTT, LAWS OF THE STATE OF TENNESSEE 823 (1821) (SCOTT); Act of Apr. 20, 1796, ch. 22, § 4, 2 SCOTT, at 568-69.

[13]The added provisions that remain in effect are Tenn. Code Ann. §§ 29-16-102 to -103, -113(b), -114(b)-(d), -118(b)-(c), -123(b), and -125 to -127 as well as everything after the first sentence in Tenn. Code Ann. § 29-16-114(a).

[14]Tenn. Code Ann. § 29-16-126, which was not part of the original statutory scheme, confers the power of eminent domain on certain types of hospitals to condemn adjacent, contiguous properties.

without the filing of a condemnation proceeding, and miscellaneous other matters.[15]  The provision on which Midwestern based its complaints reads as follows:

> A person or company actually intending to make application for the privileges herein contemplated, and entering upon the land of another for the purpose of making the requisite examinations and surveys, and doing no unnecessary injury, is liable only for the actual damage done, and, if sued in such case, the plaintiff shall recover only as much costs as damages.

Tenn. Code Ann. § 29-16-121.[16]

The only portion of the statutory text that is at all opaque is the phrase "to make application for the privileges herein contemplated." However, in the context of the statutory scheme as a whole, it is clear that the word "privileges" in Tenn. Code Ann. § 29-16-121 refers back to Tenn. Code Ann. § 29-16-101's discussion of the "privilege" of "tak[ing] the real estate of individuals" that the state has "conceded" to certain entities for the construction of works of internal improvement. Similarly, the phrase "to make application for" in Tenn. Code Ann. § 29-16-121 is a reference to the language in Tenn. Code Ann. § 29-16-104 allowing "[t]he person seeking to appropriate such land [to] file a petition in the circuit court of the county in which the land" is located to condemn the property. The property owners in this case have suggested no alternative interpretation for this statutory language.

Once the phrase "to make application for the privileges herein contemplated" is understood, the meaning of Tenn. Code Ann. § 29-16-121 snaps into focus. To paraphrase, this section grants companies with the power of eminent domain that are actually intending to condemn property for the construction of a work of internal improvement a right of temporary entry to private property for the purpose of conducting the preliminary examinations and surveys necessary to site the project. In exercising this right of entry, the company is not allowed to do any unnecessary injury to the property, and it must compensate the property owners for any actual damage. A property owner cannot defeat the right of entry by filing a lawsuit against the company, because in any such suit, the relief available to the property owner is expressly limited to recovering the cost of repairing any actual damage caused by the company.

The property owners in these cases offer two arguments in opposition to this interpretation. First, they rely on the canon of statutory construction that legislation granting the power of eminent domain is to be strictly construed against the condemning authority and liberally construed in favor

---

[15]Tenn. Code Ann. §§ 29-16-121 (preliminary entry for examinations and surveys), -122 (actual occupation of property prohibited prior to payment of compensation), -123 (inverse condemnation proceedings), -124 (statute of limitations in inverse condemnation proceedings), -125 (compensation of jurors), -126 (power of certain hospitals to condemn adjacent, contiguous properties), -127 (admissibility of property assessor appraisals in calculating compensation).

[16]According to Shannon's Code of 1896, this provision was copied from Iowa Code of 1851 § 778.

of the party resisting condemnation because the power of eminent domain operates in derogation of property rights. *City of Chattanooga v. State*, 151 Tenn. 691, 698, 272 S.W. 432, 434 (1925); *Draper v. Webb*, 57 Tenn. App. 394, 396, 418 S.W.2d 775, 776 (1967); 3 NORMAN J. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 64:6, at 345-57 (6th ed. 2001) (SUTHERLAND). While this canon of statutory construction is certainly relevant, we do not find it dispositive.

According to the property owners, Tenn. Code Ann. § 29-16-121 does not authorize a right of entry to conduct preliminary examinations and surveys. Rather, it simply limits the damages that a property owner may recover from a trespasser who enters onto property illegally. So interpreted, Tenn. Code Ann. § 29-16-121 would be nothing less than an invitation to lawlessness because it would encourage trespasses on private property by limiting the damages that trespassers would be required to pay. We decline to ascribe such a meaning to Tenn. Code Ann. § 29-16-121. Moreover, if the statute does not convey a temporary right of entry to companies with the power of eminent domain, then it does nothing at all. We decline the property owners' invitation to read Tenn. Code Ann. § 29-16-121 out of existence under the guise of "statutory interpretation."[17]

The property owners also argue that this court should not read Tenn. Code Ann. § 29-16-121 as conveying a temporary right of entry on companies with the power of eminent domain because in other statutes, the General Assembly has expressed its intent to convey such a right more clearly. As their prime example, they point to a similar provision of the Airport Authorities Act[18] which states as follows:

> In the acquisition of property by eminent domain proceedings authorized by this chapter, an authority shall proceed in the manner provided by title 29, chapter 16. For the purpose of making surveys and examinations relative to eminent domain proceedings, *it is lawful* for the authority to enter upon the land, doing no unnecessary damage.

Tenn. Code Ann. § 42-3-109 (emphasis added). We find this argument unpersuasive.

The General Assembly enacted the provision codified at Tenn. Code Ann. § 42-3-109 in 1957,[19] almost one hundred years after it enacted the text of Tenn. Code Ann. § 29-16-121. Modes of expression change over time, and we find it unremarkable that the wording chosen by the General Assembly to express an idea in 1957 would sound somewhat clearer to modern ears than the wording chosen by the General Assembly to express the same idea in 1858. More importantly, we are aware of no law, and the property owners have not pointed us to one, that requires the General Assembly

---

[17]As one leading treatise on statutory construction observes, a "narrow, strained interpretation of statutes granting eminent domain power is never justified." 3 SUTHERLAND § 64:6, at 354-55.

[18]Tenn. Code Ann. §§ 42-3-101 to -205 (2000).

[19]Act of Mar. 22, 1957, ch. 376, § 8, 1957 Tenn. Pub. Acts 1326, 1337-38.

to use the same wording to express a particular idea in every legislative enactment. The English language is incredibly flexible, and we should not expect the General Assembly to legislate in cookie-cutter fashion even in contemporaneous statutes. We cannot ignore the General Assembly's intent as expressed in Tenn. Code Ann. § 29-16-121 simply because a statute enacted almost one hundred years later expresses the same concept in a slightly more straightforward manner. On its face, Tenn. Code Ann. § 29-16-121 conveys a right of entry to conduct preliminary examinations and surveys on private property without the property owner's consent to companies that have the power of eminent domain, as long as the company is "actually intending" to file condemnation complaints to obtain the property rights necessary to construct the final project.

## III.
### PREEMPTION OF TENN. CODE ANN. § 29-16-121 BY THE NATURAL GAS ACT

The property owners also insist that Midwestern cannot rely on Tenn. Code Ann. § 29-16-121 because the state condemnation procedures have been preempted by the Natural Gas Act [15 U.S.C. §§ 717 -717w (2000)]. The trial court did not rely on federal preemption when it dismissed Midwestern's complaints. Nevertheless, we must address this argument because if the property owners are correct, it would provide an independent basis for dismissing Midwestern's complaints, and we would be required to affirm the dismissals on this alternative ground.[20]

### A.

Our federal system of government recognizes the dual sovereignty of the federal government and the various state governments. *Printz v. United States*, 521 U.S. 898, 918, 117 S. Ct. 2365, 2376 (1997); *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S. Ct. 2395, 2399 (1991). The states possess sovereignty within their particular spheres concurrent with the federal government subject only to the power of the Congress under the Supremacy Clause of the United States Constitution[21] to preempt state law. *Tafflin v. Levitt*, 493 U.S. 455, 458, 110 S. Ct. 792, 795 (1990); *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 670.

The courts, however, are reluctant to presume that preemption of state law has occurred. *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224, 113 S. Ct. 1190, 1194 (1993); *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 670. Accordingly, the courts work from the assumption that the historic powers of the states with regard to matters traditionally subject to state regulation are not displaced by a federal statute unless

---

[20]The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result. *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 789 (Tenn. Ct. App. 1999); *Allen v. Nat'l Bank of Newport*, 839 S.W.2d 763, 765 (Tenn. Ct. App. 1992); *Clark v. Metro. Gov't*, 827 S.W.2d 312, 317 (Tenn. Ct. App. 1991).

[21]U.S. Const. art. VI, cl. 2 provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the land; and the Judges of every State shall be bound thereby, any Thing in the Constitution or laws of any state to the Contrary notwithstanding."

that is the clear and manifest intent of Congress. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 540-41, 121 S. Ct. 2404, 2414-15 (2001); *Egelhoff v. Egelhoff*, 532 U.S. 141, 151, 121 S. Ct. 1322, 1330 (2001); *California Div. of Labor Standards Enforcement v. Dillingham Const., N.A.*, 519 U.S. 316, 325, 117 S. Ct. 832, 838 (1997); *Grace Thru Faith v. Caldwell*, 944 S.W.2d 607, 609 (Tenn. Ct. App. 1996).

Congressional purpose is the "ultimate touchstone" of the preemption inquiry. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 2617 (1992); *Riggs v. Burson*, 941 S.W.2d 44, 48 (Tenn. 1997). Congress's preemptive intent may be either express or implied. Express preemption occurs when the Congress includes explicit preemptive language in federal statutes. Implied preemption occurs when the federal statutes occupy the entire legislative field leaving no room for state regulation,[22] and, even where Congress has not occupied the entire field, to the extent of any outright or actual conflict between federal and state law.[23] *Lorillard Tobacco Co. v. Reilly*, 533 U.S. at 540, 121 S. Ct. at 2414; *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383 (1992); *LeTellier v. LeTellier*, 40 S.W.3d at 497; *Profill Dev., Inc. v. Dills*, 960 S.W.2d 17, 27 (Tenn. Ct. App. 1997). The categories of implied preemption are not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5, 110 S. Ct. 2270, 2275 n.5 (1990).

Any preemption inquiry must begin with the language of the federal statutes involved. In cases of express preemption, the text of the federal statute defines the domain that Congress intended to preempt. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484, 116 S. Ct. 2240, 2250 (1996). However, in both express and implied preemption cases, the federal statutory language is not considered in a vacuum. The courts must also consider the structure and purpose of the entire federal statutory scheme. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31, 116 S. Ct. 1103, 1108 (1996); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S. Ct. 478, 482 (1990).[24]

State law is displaced only to the extent that it is expressly or impliedly preempted. *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476, 116 S. Ct. 1063, 1064 (1996); *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 671. Accordingly, the proper approach is to attempt to reconcile the federal and state laws at issue, *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 182-83, 98 S. Ct. 988, 1007 (1978); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127, 94 S. Ct. 383, 389-90 (1973), rather than to seek out conflict where none clearly exists. The existence and extent of preemption are questions of law which this court reviews de novo. Tenn. R. App. P. 13(d); *State v. Scott*, 678 S.W.2d 50, 51-52 (Tenn. 1984).

---

[22]This type of implied preemption is commonly referred to as "field" preemption.

[23]This type of implied preemption is commonly referred to as "conflict" preemption.

[24]The United States Supreme Court has explained that conflict preemption occurs only when it is impossible for a private party to comply with both state and federal law or when, under the circumstances of a particular case, the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the Congress. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. at 372-73, 120 S. Ct. at 2294; *see also Watson v. Cleveland Chair Co.*, 789 S.W.2d 538, 542 (Tenn. 1989).

**B.**

The property owners insist that Congress intended to "occupy the field" of condemnation for the construction and maintenance of natural gas pipelines when it enacted the Natural Gas Act. This argument rests on two provisions of the Act. The first provision requires natural gas companies engaged in the interstate or international transportation or sale of natural gas to obtain a certificate of public convenience and necessity from FERC before "undertak[ing] the construction or extension of any facilities." 15 U.S.C. § 717f(c)(1)(A). The second confers eminent domain power on natural gas companies that have been issued a certificate of public convenience and necessity by FERC to "construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas." 15 U.S.C. § 717f(h). The property owners do not claim that these provisions expressly preempt state condemnation procedures, nor do they assert that there is any actual conflict between these provisions and Tennessee's condemnation statutes. Thus, their preemption argument is based solely on an implied "field" preemption theory.[25]

The property owners' field preemption theory founders on the language of the very provisions on which they rely. The second provision they rely upon begins as follows:

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, . . . it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, *or in the State courts*. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with *the practice and procedure in similar action or proceeding in the courts of the State where the property is situated*: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

15 U.S.C. § 717f(h) (emphasis added).

By its plain language, 15 U.S.C. § 717f(h) does several things. First, it delegates the federal power of eminent domain to natural gas companies that have been issued a certificate of public convenience and necessity by FERC. Second, it authorizes natural gas companies to exercise the federal eminent domain power in both state and federal courts. Third, it requires federal courts to follow state condemnation procedures as closely as possible when natural gas companies seek to

---

[25] At oral argument before this court, the property owners in twenty-three of the appeals expressly disclaimed any reliance on a "conflict" preemption theory. The remaining property owners did not file briefs on appeal or participate in oral argument.

exercise the federal condemnation power in federal courts. Finally, the statute limits the federal courts' jurisdiction over cases in which a natural gas company seeks to exercise the federal eminent domain power to cases involving property claimed to be worth more than $3,000. The statute makes no mention of the states' eminent domain power. It applies exclusively to the exercise of the federal eminent domain power that Congress has chosen to confer on natural gas companies that have received a certificate of public convenience and necessity from FERC.

The United States Supreme Court has addressed federal preemption of state law under the Natural Gas Act many times since the Act's enactment in 1938. In many of these cases, the Court has expressly considered whether state laws or regulations are impliedly preempted under a "field" preemption theory. *See, e.g.*, *Northwest Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 506-14, 109 S. Ct. 1262, 1272-76 (1989); *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas*, 372 U.S. 84, 89-98, 83 S. Ct. 646, 649-654 (1963); *Public Utils. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 467-70, 63 S. Ct. 369, 375-77 (1943). None of these decisions contains even the slightest indication that Congress intended the Natural Gas Act to displace the states' traditional authority to delegate their own inherent power of eminent domain for the construction of works of internal improvement.

The property owners have pointed us to no case holding that the states' authority to delegate their own power of eminent domain to companies engaged in the business of constructing works of internal improvement has been preempted by the Natural Gas Act. Courts that have considered this question have reached precisely the opposite conclusion. *Georgia Power Co. v. 54.20 Acres of Land*, 563 F.2d 1178, 1185 n.19 (5th Cir. 1977); *Robinson v. Transcon. Gas Pipe Line Corp.*, 421 F.2d 1397 (5th Cir. 1970); *see also Harmon v. Phillips Petroleum Co.*, 555 F. Supp. 447, 450 n.5 (D.C. Mont. 1982) (holding that Natural Gas Act does not require FERC's issuance of a certificate of public convenience and necessity as a condition precedent to the application of state condemnation statutes); *Southern Natural Gas Co. v. Poland*, 384 So. 2d 528, 530-31 (La. Ct. App. 1980) (same).[26] Accordingly, we reject the defendant property owners' argument that these proceedings are preempted by the provisions of the Natural Gas Act.[27]

## IV.
### THE PROPERTY OWNERS' MOTIONS TO DISMISS

The trial court's March 3, 2005 order did not specify the procedural basis for its decision to dismiss Midwestern's complaints. However, Midwestern and the property owners agree that the order can be construed as dismissing the complaints pursuant to Tenn. R. Civ. P. 12.02(6) because they fail to state a claim upon which relief can be granted. The property owners also insist that the March 3, 2005 order can be construed as dismissing the complaints for lack of subject matter

---

[26]*Cf. Oakland Club v. S.C. Pub. Serv. Auth.*, 110 F.2d 84, 85-87 (4th Cir. 1940) (construing similar provision of the Federal Power Act [16 U.S.C. §§ 791a-825r (2000)] as not preempting South Carolina eminent domain law).

[27]*See Walker v. Gateway Pipeline Co.*, 601 So. 2d 970, 974-76 (Ala. 1992) (holding that Natural Gas Act does not require issuance of FERC certificate of public convenience and necessity as a prerequisite to the exercise of pre-condemnation right of entry for preliminary examinations and surveys conferred by state law).

jurisdiction pursuant to Tenn. R. Civ. P. 12.02(1). The distinction between a dismissal under Tenn. R. Civ. P. 12.02(1) and a dismissal under Tenn. R. Civ. P. 12.02(6) is significant. Accordingly we will address each ground separately.

## A.
## The Motion to Dismiss for Lack of Subject Matter Jurisdiction

The property owners argue that the trial court lacked subject matter jurisdiction to adjudicate Midwestern's claims because Midwestern has not yet filed condemnation complaints against the properties under Tenn. Code Ann. § 29-16-104. They note that Tenn. Code Ann. § 29-16-121 was originally enacted as part of the chapter establishing the procedures for condemnation proceedings and claim that no statute outside this chapter provides procedures for the assertion of the right of preliminary entry conveyed by Tenn. Code Ann. § 29-16-121. Accordingly, they argue that there is no legal basis for the trial court's exercise of jurisdiction over these cases. This argument ignores the plain language of the condemnation statutes, not to mention the Tennessee Rules of Civil Procedure and the statutes governing declaratory judgments.[28]

### 1.

The concept of subject matter jurisdiction implicates a court's power to adjudicate a particular type of case or controversy. *Toms v. Toms*, 98 S.W.3d 140, 143 (Tenn. 2003); *First Am. Trust Co. v. Franklin-Murray Dev. Co.*, 59 S.W.3d 135, 140 (Tenn. Ct. App. 2001). A court derives its subject matter jurisdiction, either explicitly or by necessary implication, from the Constitution of Tennessee or from legislative acts. *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996); *Dishmon v. Shelby State Cmty. Coll.*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999). The parties cannot confer subject matter jurisdiction on a trial or an appellate court by appearance, plea, consent, silence, or waiver. *State ex rel. Dep't of Soc. Servs. v. Wright*, 736 S.W.2d 84, 85 n.2 (Tenn. 1987); *Team Design v. Gottlieb*, 104 S.W.3d 512, 527 (Tenn. Ct. App. 2002).

The existence of subject matter jurisdiction depends on the nature of the cause of action and the relief sought. *Landers v. Jones*, 872 S.W.2d 674, 675 (Tenn. 1994). Thus, when a court's subject matter jurisdiction is questioned, it must first ascertain the nature or gravamen of the case. *Newsome v. White*, No. M2001-03014-COA-R3-CV, 2003 WL 22994288, at *2 (Tenn. Ct. App. Dec. 22, 2003) (No Tenn. R. App. P. 11 application filed); *Levy v. Bd. of Zoning Appeals*, No. M1999-00126-COA-R3-CV, 2001 WL 1141351, at *3 (Tenn. Ct. App. Sept. 27, 2001) (No Tenn. R. App. P. 11 application filed). The court must then determine whether the Constitution of Tennessee, the General Assembly, or the common law have conferred on it the power to adjudicate cases of that sort. *Newsome v. White*, 2003 WL 22994288, at *2; *Levy v. Bd. of Zoning Appeals*, 2001 WL 1141351, at *3. Both determinations present questions of law which this court reviews de novo without a presumption of correctness. *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000); *Southwest Williamson County Cmty. Ass'n v. Saltsman*, 66 S.W.3d 872, 876 (Tenn. Ct. App. 2001).

---

[28]Tenn. Code Ann. §§ 29-14-101 to -113 (2000).

Like a motion for failure to state a claim upon which relief can be granted, a motion to dismiss for lack of subject matter jurisdiction may rest on the contents of the complaint alone. Tenn. R. Civ. P. 12.02. However, this is not always the case because a court's subject matter jurisdiction may be questioned in two ways – "facial" challenges or "factual" challenges. *Thomas v. Mayfield*, No. M2000-02533-COA-R3-CV, 2004 WL 904080, at *4-5 (Tenn. Ct. App. Apr. 27, 2004), *perm. app. denied* (Tenn. Nov. 15, 2004); 2A JAMES W. MOORE, MOORE'S FEDERAL PRACTICE ¶ 12.07[2.-1], at 12-50 to 12-55 (2d ed.1996). The method a court uses to evaluate a facial attack is quite similar to the method of deciding motions to dismiss for failure to state a claim upon which relief can be granted. *Jetform Corp. v. Unisys Corp.*, 11 F. Supp. 2d 788, 789 (E.D. Va. 1998); *Avellino v. Herron*, 991 F. Supp. 722, 725 (E.D. Pa. 1997).

A "facial" challenge makes war on the complaint itself. It asserts that the complaint, considered from top to bottom, fails to allege facts that show that the court has power to hear the case. *See, e.g., Crawford v. United States Dep't of Justice*, 123 F. Supp. 2d 1012, 1013-14 (S.D. Miss. 2000) (making a facial challenge to jurisdiction).[29] In deciding a facial challenge, the court considers the impugned pleading and nothing else. *Laird v. Ramirez*, 884 F. Supp. 1265, 1272 (N.D. Iowa 1995); *Ensign-Bickford Co. v. ICI Explosives USA, Inc.*, 817 F. Supp. 1018, 1023 (D. Conn. 1993). If a complaint attacked on its face competently alleges any facts which, if true, would establish grounds for subject matter jurisdiction, the court must uncritically accept those facts, end its inquiry, and deny the dismissal motion. *Great Lakes Educ. Consultants v. Fed. Emergency Mgmt. Agency*, 582 F. Supp. 193, 194 (W.D. Mich. 1984).

"Factual" challenges to subject matter jurisdiction require a different approach both in the trial court and on appeal. A "factual" challenge denies that the court actually has subject matter jurisdiction as a matter of fact even though the complaint alleges facts tending to show jurisdiction. It controverts the complaint's factual allegations regarding jurisdiction, *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993), and puts at issue the sufficiency of the evidence to prove facts that would bring the case within the court's subject matter jurisdiction, *Ensign-Bickford Co. v. ICI Explosives USA, Inc.*, 817 F. Supp. at 1023. "Factual" challenges to jurisdiction create "genuine issues as to material fact," but they do not require courts to convert the motion into one for summary judgment. *Chenault v. Walker*, 36 S.W.3d 45, 55-56 (Tenn. 2001).[30] Instead, the courts must resolve these factual issues, at least preliminarily. *Edick v. Poznanski*, 6 F. Supp. 2d

---

[29]Tenn. R. Civ. P. 12 is substantially identical to Fed. R. Civ. P. 12, making federal court precedents persuasive authority in construing our rule. *Byrd v. Hall*, 847 S.W.2d 208, 211 n.2 (Tenn. 1993); *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 557 (Tenn. 1990); *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d at 952 n.7.

[30]There is no analogous "factual" challenge to a complaint for failure to state a claim upon which relief can be granted under Tenn. R. Civ. P. 12.02(6). If either or both parties submit evidentiary materials outside the pleadings in support of or in opposition to a Tenn. R. Civ. P. 12.02(6) motion and the trial court decides to consider these materials, the trial court must convert the motion to dismiss to a motion for summary judgment, *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d at 952, and notify the parties that it has made the conversion, *Teaster v. Tenn. Dep't of Corr.*, No. 01A01-9608-CH-00358, 1998 WL 195963, at *3-4 (Tenn. Ct. App. Apr. 24, 1998) (No Tenn. R. App. P. 11 application filed). Once a motion to dismiss has been converted to a motion for summary judgment, the trial court must deny the motion if there exists any genuine dispute about the material facts of the case. *Byrd v. Hall*, 847 S.W.2d at 211; *Pate v. Serv. Merch. Co.*, 959 S.W.2d 569, 573 (Tenn. Ct. App. 1996).

666, 668 (W.D. Mich. 1998); *Malkin v. United States*, 3 F. Supp. 2d 493, 497 (D. N.J. 1998). The court must "determine whether the evidence in favor of finding jurisdiction is sufficient to allow the case to proceed." *Chenault v. Walker*, 36 S.W.3d at 56.

In assessing "factual" challenges to subject matter jurisdiction at the motion to dismiss stage, courts must keep in mind that the plaintiff bears the ultimate burden of proving facts establishing the courts' jurisdiction over the case. *Chenault v. Walker*, 36 S.W.3d at 56; *Wilson v. Sentence Info. Servs.*, No. M1998-00939-COA-R3-CV, 2001 WL 422966, at *5 (Tenn. Ct. App. Apr. 26, 2001) (No Tenn. R. App. P. 11 application filed). If a defendant has filed affidavits or other competent evidentiary materials challenging the plaintiff's jurisdictional allegations, the plaintiff may not rely on the allegations of the complaint alone, but instead must present evidence by affidavit or otherwise that makes out a prima facie showing of facts establishing jurisdiction. Tenn. R. Civ. P. 43.02; *Chenault v. Walker*, 36 S.W.3d at 56. The trial court will "take as true the allegations of the nonmoving party and resolve all factual disputes in its favor . . . [without crediting] conclusory allegations or draw[ing] farfetched inferences." *Chenault v. Walker*, 36 S.W.3d at 56 (citations omitted); *accord Wilson v. Sentence Info. Servs.*, 2001 WL 422966, at *5. However, the court's initial resolution of the factual issues relating to jurisdiction is not final and conclusive. As the Tennessee Supreme Court has explained, the court does "not make any finding as to whether [the plaintiff's] version of events is, in fact, correct. That will be for a jury to decide if the case goes to trial." *Chenault v. Walker*, 36 S.W.3d at 56.

Midwestern's complaints were not verified, and Midwestern did not file affidavits or other competent evidence in support of its motions. The property owners likewise filed no affidavits or other evidence in opposition to Midwestern's complaints and motions. At the February 22, 2005 hearing, the trial court repeatedly offered both sides the opportunity to present testimony or other evidence, but they declined the trial court's invitation to do so.[31] Thus, the March 3, 2005 order denying Midwestern's motions and dismissing its complaints did not rest on any evidence contained in the record. If the trial court dismissed the complaints for lack of subject matter jurisdiction, it did so based on a "facial" rather than a "factual" challenge to its subject matter jurisdiction. Accordingly, we must assume the truth of the allegations contained in Midwestern's complaints and decide whether the alleged facts provide a basis for the trial court's exercise of subject matter jurisdiction over these cases.

**2.**

The General Assembly's intent regarding the relative timing of the entry for preliminary examinations and surveys under Tenn. Code Ann. § 29-16-121 and the filing of a condemnation complaint under Tenn. Code Ann. § 29-16-104 is clear from the statutory text. Tenn. Code Ann. § 29-16-121 authorizes the preliminary right of entry when a company is "actually intending" to file initiate condemnation proceedings, not after a condemnation complaint has already been filed.

---

[31] The property owners representing themselves pro se sought to testify at the very beginning of the hearing, but the trial court rebuffed their request because the issue under consideration at that time was administrative in nature.

If there were any doubt regarding the sequence of events envisioned by the General Assembly, it is decisively resolved by reading Tenn. Code Ann. § 29-16-121 in the context of the provision immediately following it both in the original 1858 Code and in the current edition of the Tennessee Code Annotated. Read in order, these two sections provide as follows:

> A person or company *actually intending* to make application for the privileges herein contemplated, and entering upon the land of another for the purpose of making the requisite examinations and surveys, and doing no unnecessary injury, is liable only for the actual damage done, and, if sued in such case, the plaintiff shall recover only as much costs as damages.

> No person or company shall, however, enter upon such land for the purpose of *actually occupying* the right-of-way, until the damages assessed by the jury of inquest and the costs have been actually paid; or if an appeal has been taken, until the bond has been given to abide by the final judgment as provided in § 29-16-120.

Tenn. Code Ann. §§ 29-16-121 to -122 (originally codified at Code of 1858 §§ 1345-1346) (emphasis added).[32]

These sections clearly distinguish between "entering upon the land of another for the purpose of making the requisite examinations and surveys" and "enter[ing] upon such land for the purpose of actually occupying the right-of-way." Tenn. Code Ann. § 29-16-121 authorizes companies with the power of eminent domain to enter private property to conduct "the requisite examinations and surveys" as long as the company does no unnecessary injury and pays the property owner for any actual damage. Tenn. Code Ann. § 29-16-122 warns, however, that this temporary, limited right of preliminary entry must not be confused with the right to enter private property for the purpose of "actually occupying" it, which the statutory scheme authorizes only after the filing of a condemnation complaint, determination by a jury of the amount due to the property owner, and payment of compensation to the property owner for the taking or the posting of a bond sufficient to cover this sum as well as the court costs pending appeal. Thus, under the plain language of the statute, the right of entry for preliminary examinations and surveys arises prior to the filing of a condemnation complaint.

The statutory condemnation procedures represent the General Assembly's considered policy judgment regarding how best to balance the rights of private property owners against the public's interest in the construction of infrastructure projects that serve the common good. The General Assembly has delegated the awesome power of eminent domain to companies involved in the

---

[32]In the 148 years since the General Assembly first adopted the statutory scheme, the language of these two sections has remained virtually unchanged. The phrase "as provided in § 29-16-120" in Tenn. Code Ann. § 29-16-122 originally read "as before provided." Code of 1858 § 1346.

construction and operation of certain works of internal improvement.[33] These projects are generally linear in nature, and they cannot be constructed unless the company constructing them is able to obtain property rights along a continuous path from the starting point to the end of the project. The completion of such projects often requires the expenditure of substantial resources, and the General Assembly could reasonably conclude that companies would be unwilling, or at least hesitant, to undertake such costly projects if they could not determine early in the process whether a proposed route was physically possible, much less economically feasible.[34] Thus, with Tenn. Code Ann. § 29-16-121, the General Assembly sought to encourage the construction of critical infrastructure projects by conferring on companies that have the power of eminent domain the additional ability to enter private property on a temporary, limited basis to conduct the examinations and surveys necessary for the siting of such projects.[35]

Tenn. Code Ann. § 29-16-121 is not, as the property owners claim, some kind of outright assault on the right of property owners to control access to their properties. As noted above, the General Assembly has only conferred the power of eminent domain on a small category of private companies engaged in the construction of vital infrastructure projects. Moreover, the decision before the General Assembly was not a simple choice between protecting or curtailing traditional property rights. A policy that rigidly enforced an absolute right to exclude others from one's property at the property owner's whim could well have the practical effect of undermining the property rights of others. If companies with the power of eminent domain cannot temporarily access properties along the proposed route of a linear construction project to perform the examinations and surveys necessary to site the project, they will likely be forced to file condemnation complaints much earlier in the process and against a much greater number of properties. Such a process would create clouds on the titles of large numbers of properties for long periods of time before the company, the courts, and the appropriate governmental regulatory agencies have even determined which properties will ultimately be needed for the construction of the final project.

---

[33] *E.g.*, Tenn. Code Ann. §§ 65-6-109 (2004) (railroad companies), 65-21-101 (2004) (telegraph and telephone companies), 65-22-101 (2004) (power companies), 65-27-101 (2004) (water companies), 65-28-101 (2004) (natural gas companies).

[34] As the Tennessee Supreme Court long ago observed in connection with the siting of a railroad line:

Necessarily the location must be controlled, to a large extent, by the topography of the country, and the natural advantages and obstacles to be met on the different routes; and the determination of these questions rests largely in the [company's] engineer, and upon his [or her] judgment and discretion the location must largely depend.

*Tenn. Cent. R. Co. v. Campbell*, 73 S.W. 112, 116 (Tenn. 1903).

[35] As one commentator has observed, the "power of eminent domain has been, and remains, a necessary element to accomplish great public enterprises." 3 SUTHERLAND § 64:6, at 355.

**3.**

We have already noted that Tenn. Code Ann. § 29-16-121 is not an invitation to lawlessness. Before exercising its rights under the statute, a company must either reach an agreement with the affected property owners or must obtain an order confirming its right to conduct preliminary examinations and surveys.[36] Disputes between the property owners and the company regarding the need for or extent of particular examinations and surveys can be resolved by the court asked to enter the order granting the temporary right of entry. These procedural protections are necessary not only to protect the due process rights of the property owners but also to avoid volatile and potentially violent confrontations between the company and the property owners.[37]

Contrary to the property owners' claim, the Tennessee Rules of Civil Procedure and the statutes governing declaratory judgments establish procedures for the assertion and enforcement of the right of entry conferred by Tenn. Code Ann. § 29-16-121. Tenn. R. Civ. P. 71 provides that the "procedure for the condemnation of both real and personal property under the power of eminent domain shall be in accordance with the statutes of this state," and that "to the extent that they are not in conflict with or do not contradict or contravene the provisions of said statutes, these Rules, where applicable, shall be followed." Thus, the Tennessee Rules of Civil Procedure supplement the statutory condemnation scheme.

Tenn. Code Ann. § 29-14-103 provides that "[a]ny person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." Further, Tenn. Code Ann. § 29-14-110 empowers courts to grant "[f]urther relief based on a declaratory judgment or decree" whenever such further relief is "necessary or proper," and that "application therefor shall be by petition to a court having jurisdiction to grant the relief." The stated purpose of these statutes is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations," and it is "to be liberally construed and administered" to achieve this remedial purpose. Tenn. Code Ann. § 29-14-113.

Although Midwestern's complaints were not styled as "Complaints for Declaratory Judgments," it is well established that the courts of this state look to the substance rather than the form of pleadings in determining their nature and effect. *Morgan v. Layne*, 165 Tenn. 513, 518, 56 S.W.2d 161, 162 (1933); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 300 (Tenn.

---

[36]At oral argument before this court, Midwestern stated unequivocally that it has not and would not attempt to exercise the right of entry conveyed by Tenn. Code Ann. § 29-16-121 without first either obtaining the property owner's permission to enter the property or filing suit against the property owner and obtaining a court order confirming its right of preliminary entry. We fully expect Midwestern to comply with its representations to this court. *Alliance for Native Am. Indian Rights in Tenn., Inc. v. Nicely*, ___ S.W.3d ___, ___ (Tenn. Ct. App. 2005).

[37]*See Tenn. Elec. Power Co. v. Holt*, 3 Tenn. App. 372, 373-74 (1926) (involving a property owner who dynamited concrete base for a steel tower that a power company had constructed on property he claimed to own); *see also* Model Eminent Domain Code § 301(a)(3) (1974), 13 U.L.A. 30 (2002) (authorizing pre-condemnation right of entry for examinations and surveys following reasonable efforts to notify the property owner and payment of compensation for any resulting damages as long as the entry is "accomplished peaceably and without inflicting substantial injury").

-19-

Ct. App. 2001). Midwestern filed its complaints against the property owners rather than the properties. The relief sought in the complaints – i.e., a declaration of its rights under Tenn. Code Ann. § 29-16-121 and an order enforcing these rights – is classic declaratory judgment relief. Thus, we have no difficulty concluding that Midwestern's complaints against the property owners were, in essence, complaints for declaratory judgment. Midwestern was not required to file condemnation complaints against the properties as a prerequisite to asserting and seeking court enforcement of its rights under Tenn. Code Ann. § 29-16-121.[38] Accordingly, we reject the property owners' argument that the trial court lacked subject matter jurisdiction over these cases.

**B.**
**The Motion to Dismiss for Failure to State a Claim**

The property owners also insist that the trial court properly dismissed Midwestern's complaints because they fail to state a claim upon which relief can be granted. We have already addressed the property owners' arguments based on their interpretation of Tennessee's condemnation laws and the Natural Gas Act. In light of our interpretation of the relevant state and federal law, we have determined that Midwestern's complaints state a claim upon which relief can be granted.

**1.**

A motion to dismiss a complaint for failure to state a claim for which relief can be granted tests the legal sufficiency of the plaintiff's pleading. *Givens v. Mullikin*, 75 S.W.3d 383, 406 (Tenn. 2002); *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002). The motion requires the court to review the complaint alone, *Mitchell v. Campbell*, 88 S.W.3d 561, 564 (Tenn. Ct. App. 2002), and to look to the complaint's substance rather than its form, *Kaylor v. Bradley*, 912 S.W.2d 728, 731 (Tenn. Ct. App. 1995). Dismissal under Tenn. R. Civ. P. 12.02(6) is warranted only when the alleged facts will not entitle the plaintiff to relief, *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002), or when the complaint is totally lacking in clarity and specificity, *Dobbs v. Guenther*, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992).

A Tenn. R. Civ. P. 12.02(6) motion admits the truth of all the relevant and material factual allegations in the complaint but asserts that no cause of action arises from these facts. *Davis v. Tennessean*, 83 S.W.3d 125, 127 (Tenn. Ct. App. 2001); *Pendleton v. Mills*, 73 S.W.3d 115, 120 (Tenn. Ct. App. 2001). Accordingly, in reviewing a trial court's dismissal of a complaint under Tenn. R. Civ. P. 12.02(6), we must construe the complaint liberally in favor of the plaintiff by taking all factual allegations in the complaint as true, *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997), and by giving the plaintiff the benefit of all inferences that can reasonably be drawn

---

[38] Tenn. Code Ann. § 29-14-102(a) ("Courts of record within their respective jurisdictions have the power to declare rights, status, or other legal relations whether or not further relief is or could be claimed."); Tenn. R. Civ. P. 57 ("The existence of another adequate remedy does not necessarily preclude a judgment for declaratory relief in cases where it is appropriate."); *City of Chattanooga v. State*, 151 Tenn. at 698, 272 S.W. at 434 ("Of course the power of eminent domain is to be strictly construed, and the procedure prescribed by the statute must be followed. There is no reason, however, why the Legislature may not prescribe two methods of procedure, and this is frequently done as will appear from an examination of the authorities referred to in 20 C.J. 81.").

from the pleaded facts, ROBERT BANKS, JR. & JUNE F. ENTMAN, TENNESSEE CIVIL PROCEDURE § 5-6(g), at 5-110 (2d ed. 2004). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo without a presumption of correctness. *Snyder ex rel. Bell v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); *Stein v. Davidson Hotel Co.*, 945 S.W.2d at 716.

**2.**

Each of the complaints Midswestern filed in these cases contained the following allegations: (1) that Midwestern owned and operated an interstate gas pipeline; (2) that Midwestern has the power of eminent domain under state law; (3) that Midwestern intends to construct an extension of an existing pipeline in Sumner and Trousdale Counties; (4) that Midwestern desires to conduct preliminary examinations and surveys pursuant to Tenn. Code Ann. § 29-16-121; and (5) that Midwestern intends to exercise its power of eminent domain if it is forced to condemnation actions to obtain the easements needed to construct the pipeline. For the purpose of the property owners' motion to dismiss, we must take each of these allegations as true.

We have already determined that Tenn. Code Ann. § 29-16-121 gives entities with condemnation power the right to conduct preliminary examinations and surveys on property that they may be required to condemn in order to construct a public improvement. Tenn. Code Ann. § 29-16-121 is not preempted by the federal Natural Gas Act, and entities seeking the right to conduct preliminary examinations and surveys need not first file a condemnation proceeding or obtain a certificate of public convenience and necessity from FERC. Further, state courts have subject matter jurisdiction to hear and decide lawsuits filed by entities seeking to confirm their rights under Tenn. Code Ann. § 29-16-121 or by property owners seeking damages for unnecessary injury to their property resulting from the preliminary examinations or surveys. Based on these conclusions, Midwestern's complaints clearly state a claim upon which relief can be granted, and thus the trial court erred by dismissing them pursuant to Tenn. R. Civ. P. 12.02(6).

**V.**

We reverse the March 3, 2005 order dismissing Midwestern's petition and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to James R. Stephenson and Debbie Stephenson for which execution, if necessary, may issue.

_____

WILLIAM C. KOCH, JR., P.J., M.S.